COMMONWEALTH *vs.* MASS. CRINC & others.[1]

Suffolk.  November 9, 1983. — May 24, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Beverage Containers.  Massachusetts Antitrust Act.  Attorney General.  Injunction.  Alcoholic Liquors*, Antitrust laws.

Discussion of the factors which a judge is to consider, including whether there exists a likelihood of a statutory violation and how such a violation affects the public interest, in deciding whether to grant a request by the Attorney General for a preliminary injunction to restrain violations of the law.  [86-90]

The activities of thirteen Massachusetts beer distributors and a container recovery corporation wholly owned by them were not exempt from scrutiny under the State Antitrust Act either by reason of the exemption contained in G. L. c. 93, § 7, or on the basis of § 2 of the Twenty-first Amendment to the Federal Constitution, where the conduct alleged by the Attorney General to constitute unfair trade practices was not mandated by statute, specifically G. L. c. 94, §§ 322-327 (bottle bill), or by regulation.  [90-92]

A judge correctly enjoined thirteen Massachusetts beer distributors and a container recovery corporation wholly owned by them (a) from imposing a charge of three quarters of a cent for each returnable beer container commingled with containers of other brand distributors, and deducting this charge from the handling fee guaranteed to dealers by G. L. c. 94, § 323 (*c*), and regulations thereunder, and (b) from charging dealers a deposit for original storage cartons obtained from the defendants' processing centers, where the Attorney General demonstrated a likelihood of succeeding on his claims that the fees and deposits constituted price-fixing in violation of the State Antitrust Act and also violated provisions of G. L. c. 94, §§ 322-327 (bottle bill).  [92-95]

---

[1] The defendant distributors and shareholders of Mass. CRINC are:  Atlas Distributing Corp.; Burke Beverage, Inc.; August A. Busch & Co. of Massachusetts, Inc.; Consolidated Beverages, Inc.; Commercial Distributing Company, Inc.; The Fahey Beverage Company, Inc.; Girardi Distributors, Inc.; Martin Distributing Company, Inc.; Mooney & Company, Inc.; D.J. Reardon Co., Inc.; J.J. Taylor Distributing Company; Williams Distributing Corp.; and Merrimack Valley Distributing Company.

Although vacating that portion of a judge's order enjoining thirteen Massachusetts beer distributors and a container recovery corporation wholly owned by them from charging dealers for recycling receptacles provided by the firm, this court emphasized that the distributors, as competitors, may not collaborate on prices that they will charge for the receptacles. [95]

A judge was warranted in enjoining thirteen Massachusetts beer distributors and a container recovery corporation wholly owned by them from requiring beer dealers to comply with the recovery corporation's schedule for collection of returnable beer containers, or be charged for any additional pick-up, where the Attorney General was likely to prevail on his contention that the restrictive collection schedule and the additional charges on dealers violated a regulation promulgated to effectuate the purposes of G. L. c. 94, §§ 322-327 (bottle bill), and also adversely affected the public interest in controlling beverage prices and in providing an incentive for the return of empty containers. [95-97]

A judge erred in enjoining thirteen Massachusetts beer distributors and a container recovery corporation wholly owned by them from requiring designated dealers to return beer containers only to the defendant recovery corporation and from refusing to deal with any third person offering container recovery services on the same or better terms, where the record did not support the judge's conclusion that defendants unlawfully foreclosed the entry of others into the container recovery market in violation of G. L. c. 93, § 4. [97-98]

A judge erred in enjoining thirteen Massachusetts beer distributors from paying to a container recovery corporation wholly owned by them monies due the recovery corporation unless the distributors make available to their designated dealers and to any other recovery firm the same schedule of fees and times of payment, where the Attorney General had not demonstrated that he was likely to prevail on the merits of an antitrust action charging that the distributors' fee practices constituted unlawful price-fixing. [98-99]

A judge erroneously ordered that a container recovery corporation, wholly owned by thirteen Massachusetts beer distributors, must pay dealers the deposits and handling fees to which they were entitled within fifteen days after collecting returnable containers, inasmuch as no provision of G. L. c. 94, §§ 322-327 (bottle bill), requires that such payments be made at a particular time following collection. [99]

Absent a specific statutory violation, no justification existed for an injunction barring a container recovery corporation, wholly owned and operated by thirteen Massachusetts beer distributors, from raising the service fees payable to it by beer distributors. [99]

CIVIL ACTION commenced in the Superior Court Department on March 7, 1983.

A motion for preliminary injunctive relief was heard by *Ronan,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Donald B. Gould* for J.J. Taylor Distributing Company *(H. Glenn Alberich* for Mass. CRINC & others; *Leonard F. Clarkin* for Mooney & Company, Inc.; *Francis D. Dibble, Jr.,* for Burke Beverage, Inc., & others; *& Joseph B. Pritti,* of New York, for Merrimack Valley Distributing Company with him).

*Peter E. Moll,* of the District of Columbia, for August A. Busch & Co. of Massachusetts, Inc.

*Alan L. Kovacs,* Assistant Attorney General *(Dennis M. Ryan,* Assistant Attorney General, with him) for the Commonwealth.

LIACOS, J.  The defendants, Mass. CRINC (Mass. Container Recovery, Inc.) and thirteen Massachusetts beer distributors, appeal pursuant to G. L. c. 231, § 118, from an order of a judge in the Superior Court, dated April 29, 1983, issuing a preliminary injunction.  See Mass. R. Civ. P. 65 (b), 365 Mass. 832 (1974).[2]  The injunction, sought by the Attorney General as part of the relief requested in his civil action against the defendants, restrained several of the defendants' business activities and required them to engage in other particular activities.  Although the defendants do not dispute any of the factual findings made by the judge, they claim that he failed to apply the correct legal standards to the facts, and thus improperly issued the injunction.  The defendants also contend that portions of the order are overly broad and vague, and alter the status quo by their mandatory terms.

---

[2]General Laws c. 231, § 118, as appearing in St. 1982, c. 65, provides in relevant part:  "A party aggrieved by an interlocutory order of a trial court justice in the superior court department . . . granting . . . a preliminary injunction . . . may appeal therefrom . . . subject to the provisions of section ten of chapter two hundred and eleven A, to the supreme judicial court, which shall affirm, modify, vacate, set aside, reverse the order or remand the cause and direct the entry of such appropriate order as may be just under the circumstances."

We state first the procedural and substantive facts necessary to the consideration of this appeal. In 1981, the Legislature enacted St. 1981, c. 571 (bottle bill), effective January 17, 1983, requiring that each beverage container sold must carry a refund value or deposit of at least five cents. See G. L. c. 94, § 322.[3] Distributors must refund deposits to any dealer or redemption center who returns to them empty containers of the type, size, and brand that those distributors have sold within the past sixty days. See G. L. c. 94, §§ 323 (*c*), (*e*). The bottle bill and regulations issued pursuant to it provide that the distributor must pay the dealer a handling fee of at least two cents a container, provided the containers are presented at the time and place of delivery of filled containers. See G. L. c. 94, § 323 (*c*); 301 Code Mass. Regs. § 4.05(2), (4) (1983).[4] Cf. G. L. c. 94, § 323 (*e*) (redemption center refunds). The regulations promulgated by the Secretary of Environmental Affairs to effectuate the objectives of the bottle bill further provide that "[a]cceptance of beverage containers from dealers shall be the *responsibility and expense of distributors,* and *shall not be made less convenient . . . for dealers than accept-ance at the time of delivery of filled containers*" (emphasis supplied). 301 Code Mass. Regs. § 4.05(2) (1983).

The defendants, except Mass. CRINC, are distributors (i.e., wholesalers) in the malt beverage distribution market in Massachusetts. Several defendants do not have adequate facilities to handle the large amount of returnable containers that they are obligated to accept under the bottle bill. Based on a feasibility study and on legal advice, some of the defendants concluded that the formation of a single corporate entity to perform all collection and recycling functions for Massachusetts beer

---

[3]General Laws c. 94, § 322, as amended by St. 1983, c. 96, § 1, provides, in part: "Every beverage container sold . . . in the commonwealth shall have a refund value of not less than five cents."

[4]Although the bottle bill prescribes a handling fee of at least one cent a container, the Secretary of Environmental Affairs, charged with administering the law and promulgating regulations to effectuate its purposes, G. L. c. 94, § 326, has mandated that the handling fee should be two cents a container. 301 Code Mass. Regs. § 4.05(2) (1983).

distributors would be the most cost efficient and profitable means for individual distributors to fulfil their bottle bill obligations. The defendant distributors formed Mass. CRINC (CRINC), a corporation wholly owned and controlled by the thirteen defendants who were, and are, competitors in the Massachusetts wholesale beer market.

The defendant distributors control approximately two-thirds of the Massachusetts malt beverage distribution market. They and other distributors contracted for CRINC's services. The defendants claim that their contract with CRINC constitutes the only practical and economic manner in which they could adhere to the mandate of the bottle bill, given their inadequate facilities and the substantial capital expenditures required to enable them to collect and process containers. The CRINC service contract provided that effectively CRINC would be given the exclusive right to pick up and to process returnable beer containers from all off-premise dealers in Massachusetts who purchased these products from a CRINC affiliated distributor. CRINC would pick up empty beer containers from each designated dealer, process the containers at one of its recycling plants, and sell the scrap produced at the highest price available on a continuing basis. In return for CRINC's services, the contract provided that the distributors pay to CRINC fees calculated by the can or by the bottle.[5] Although such fees were computed with the goal of attracting investors by providing a sufficient return, CRINC agreed that any fee increase during the contract term would be based only on the corporation's operating costs and would not include any additional profit margin. To date, the defendants have not realized a monetary return on their investments in CRINC. In fact, CRINC has sustained a net loss in its first year of operation of $1,902,943.

The chairman of CRINC stated that the costs incurred in providing the company's services would be reflected in beer prices. He anticipated, however, that the efficiency resulting from a

[5]The distributors were required to pay two cents a can, fifty-eight cents a case of refillable bottles, and fifty-three cents a case of nonrefillable bottles.

combined distributor collection service would maintain beer prices at as competitive a level as the requirements of the bottle bill would allow. Following the implementation of the bottle bill in January, 1983, the defendants raised their beer prices an average of $1.00 a case.[6] The contract for services between CRINC and a distributor provided that CRINC would pick up returnable containers at each retail dealer's place of business no less than once a week. If the dealer decided that this schedule did not satisfy the distributor's obligations under the bottle bill, CRINC would arrange pickups contemporaneously with the distributor's deliveries of beer to the dealer. The contract further provided that each unscheduled container collection would cost the retail dealer $20.

CRINC would only pick up returnable cans which were stored in recycling bags furnished by CRINC, at cost, to the dealers. CRINC sought to promote the return of bottles in their original, or mother, carton by charging dealers twenty-five cents for using cardboard shells for storing empty beer bottles obtained from one of their processing centers. Furthermore, CRINC would deduct three-quarters of a cent a can from the mandated two-cent handling fee whenever the dealer neglected to sort cans by brand or supplier. On the fifteenth of each month, dealers would be remitted the refunds and handling fees due them from collection completed the previous month.

In March, 1983, the Attorney General filed a complaint against the defendants in Superior Court in Suffolk County, alleging that CRINC's activities violated several provisions of the Massachusetts Antitrust Act and the bottle bill. The Commonwealth simultaneously sought a preliminary injunction, seeking to enjoin CRINC's allegedly unlawful practices. Following a hearing and the submission of voluminous affidavits and other documentary evidence, a judge of the Superior Court granted the Commonwealth's motion on April 29, 1983.

---

[6] However, the price increases of all but one of the defendants declined substantially as of June, 1983, while the prices of some of the distributors who are not CRINC shareholders have continued to increase.

Since the defendants do not dispute the judge's factual findings, we need not review them here. Based on his findings, the judge concluded that there existed a substantial likelihood that the defendants violated the Massachusetts Antitrust Act and the bottle bill by thwarting the entry of competitors in the newly formed container recovery market.

The judge enjoined and restrained the defendant distributors from (1) requiring that any dealer return containers only to CRINC, at times scheduled by CRINC, and from refusing to do business with a third person or redemption center offering services on the same or better terms than CRINC; (2) refusing to accept empty beverage containers when they deliver products to a dealer except where the dealer has entered into a voluntary agreement regarding collection with some third person or where the defendant distributor has made arrangement with CRINC or others to pick up empty returnables from the dealer at times as convenient to the latter as the times of delivery; (3) accepting back any mother carton for any fee, credit, or benefit to CRINC unless the defendants offer the same benefit to dealers doing business directly with third persons or other redemption centers; (4) paying CRINC any fees unless defendants make available to dealers doing business directly, and to third persons or redemption centers, the same uniform schedule of fees. CRINC was enjoined from (1) failing to pay anyone from whom CRINC has accepted returnables, the appropriate deposit and handling fees within fifteen days of accepting containers; (2) failing, upon acceptance of containers, to pay the two cents a container handling fee with no deduction for commingling; (3) charging dealers with the cost of receptacles for storing empty beverage containers; (4) increasing the current service fees required to be paid to CRINC by its distributor clients.

The same Superior Court judge granted a motion by the defendants to stay the preliminary injunction on May 10, 1983.[7]

---

[7] In this order the judge clarified certain bases for the previously imposed injunction. Relevant to our analysis of his order, the judge determined that the defendants' refusal to pay the statutorily mandated two cent handling fee should be enjoined because this action contravenes the Legislature's collection scheme which gives dealers an incentive to return empty beverage containers to the dis-

On June 1, 1983, a single justice of the Appeals Court extended the stay until that court issued a further order and also directed the parties to seek reconsideration in the Superior Court.

The Superior Court judge who granted the injunction and the stay denied the defendants' request for reconsideration on June 30, 1983, and continued the stay of the injunction. In this final order the judge explained that he did not prohibit CRINC's agreed-on price structure in his initial injunction order; he intended only to enjoin the defendants from precluding any other entrants in the recycling market from taking advantage of CRINC's uniform fees and charges. The judge concluded, however, that no new circumstances existed which would prompt the court to alter the discretionary relief granted in the earlier order. Since the judge did not change any portions of the initial order, we will review it as he issued it on April 29, 1983.

On August 30, 1983, the same single justice of the Appeals Court entered an order continuing the stay of the injunction "pending final disposition of the appeal or until further order of this court."[8] We then transferred the appeal to this court on our own motion.

1. *Legal standard of appellate review of interlocutory order granting injunctive relief.* In reviewing an interlocutory order granting or denying injunctive relief under G. L. c. 231, § 118, an appellate court ordinarily follows the standard of review set forth in *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass.

---

tributors. According to the judge, the burden that this injunction may have on the defendants in escalating their cost of doing business and on the market price of beer must be counterbalanced by the strong public policy concerns which arise because aspects of the defendants' activity may violate the Antitrust Act and the bottle bill.

On May 11, 1983, a different judge of the Superior Court allowed, in part, the defendants' joint motion to dismiss those portions of the Attorney General's complaint seeking money damages for retail consumers. The judge ruled, inter alia, that the Attorney General was barred from bringing a parens patriae action on behalf of indirect purchasers. See *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720 (1977).

[8]The order was amended on September 2, 1983, to reflect the correct date of the order by the Superior Court judge which stayed the injunction.

609 (1980). See G. L. c. 231, § 118. The defendants argue that the *Cheney* standard is applicable here, and, under it, we must vacate the order of the judge below. While we agree that much of the doctrine enunciated in *Cheney* is applicable, we conclude that questions of irreparable harm are not material in a case such as this.

The *Cheney* court posited that an appellate court must determine whether a judge, in granting or refusing to grant an injunction, "applied proper legal standards and whether there was reasonable support for [his or her] evaluation of factual questions." *Id.* at 615, quoting *Hochstadt* v. *Worcester Found. for Experimental Biology,* 545 F.2d 222, 229 (1st Cir. 1976). In reviewing a Superior Court judge's order, therefore, the *Cheney* court decided that it must focus on the same factors which the judge considered in ruling on the motion for a preliminary injunction, and determine whether the judge applied the proper legal standard in granting or refusing to grant the requested relief. *Cheney, supra* at 615-616. Although an appellate court must accord weight to the judge's exercise of discretion, we further stated that the judge's legal conclusions are subject to broad review and susceptible of reversal if incorrect. *Id.* at 616. Moreover, we decided that an appellate court is free to draw its own factual conclusions from the record if the order is predicated solely on documentary evidence.

We reasoned in *Cheney* that, to issue injunctive relief correctly, a judge initially must consider whether the plaintiff has demonstrated that without the relief he would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. *Id.* at 617 n.11. The plaintiff also must show that there is a likelihood that he would prevail on the merits of the case at trial. The judge then must balance these two factors against the showing of irreparable harm which would ensue from the issuance, or the denial, of an injunction and the "chance of success on the merits" presented by the defendant. *Id.* at 617. An injunction may issue properly only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweigh the de-

fendant's probable harm and likelihood of prevailing on the merits of the case.

It is the failure of the judge to consider the factor of irreparable harm and to balance that factor against the countervailing harm to the defendants and the likelihood of the success of the parties, of which the defendants here complain. They are correct in stating that the judge did not do as *Cheney* would require, if applicable. But it is this requirement of *Cheney* that is inapposite to a case such as this. The *Cheney* court concerned itself with the appropriate standards where the dispute before a court was one between two private parties. Here, the Attorney General, as chief law enforcement officer of the Commonwealth, is seeking to enforce the laws of the Commonwealth. In bringing this action, the Attorney General is acting in accordance with his broad common law and statutory powers to represent the public interest. See *Feeney* v. *Commonwealth,* 373 Mass. 359, 363-366 (1977); G. L. c. 12, § 3. He is given a specific mandate by G. L. c. 12, § 10, as appearing in St. 1960, c. 788, to "take cognizance of all violations of law or of orders of courts, tribunals or commissions affecting the general welfare of the people, *including combinations, agreements and unlawful practices in restraint of trade or for the suppression of competition, or for the undue enhancement of the price of articles or commodities in common use,* and shall institute . . . such criminal or civil proceedings before the appropriate . . . courts . . . as he may deem to be for the public interest" (emphasis supplied).

Thus, the Attorney General has a general statutory mandate, in addition to any specific statutory mandate, to protect the public interest. He also has a common law duty to represent the public interest and enforce public rights. *Lowell Gas Co.* v. *Attorney Gen.,* 377 Mass. 37, 48 (1979). The Attorney General is given specific power also to enforce the Antitrust Act, the Consumer Protection Act, and the bottle bill. See, e.g., G. L. c. 93, §§ 8, 9, 12, 13; G. L. c. 93A, §§ 2, 4, 7, 8, 10; G. L. c. 94, § 327. These statutes provide instances where acts in violation of statutory provisions may be enjoined in the public interest. See, e.g., G. L. c. 93A, § 4 (public inter-

est); G. L. c. 93, § 9 (Attorney General may seek to enjoin acts violating Antitrust Act). Cf. G. L. c. 12, § 10 (Attorney General may act "for the public interest").

In a suit such as this "[t]he standard of requiring a demonstration of immediate irreparable harm, employed in civil litigation as a condition precedent to the granting of injunctive relief, is not a prerequisite to the allowance of an injunction to the plaintiff in this case. 'When the government acts to enforce a statute or make effective a declared policy of [the Legislature], the standard of public interest and not the requirements of private litigation measure the propriety and need for injunctive relief'" (citation omitted). *United States* v. *D'Annolfo,* 474 F. Supp. 220, 222 (D. Mass. 1979). Thus, before issuing the preliminary injunction, a judge is required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public. See generally *Planned Parenthood League* v. *Bellotti,* 641 F.2d 1006 (1st Cir. 1981); *United States* v. *Lit Drug Co.,* 333 F. Supp. 990, 998 (D.N.J. 1971). Moreover, because the Attorney General is empowered to enforce the Antitrust Act, the Consumer Protection Act, and the bottle bill, and to restrain violations of these statutes through civil actions, and since the Attorney General alleged that the defendants' practices restrain trade, the judge who decides whether an injunction should issue needs to consider specifically whether there is a likelihood of statutory violations and how such statutory violations affect the public interest.[9] See *Hecht Co.* v. *Bowles,* 321 U.S. 321, 330-331 (1944) (when government agency seeks to enjoin alleged statutory violations, judge must decide how such actions affect public interest).[10] The Attorney General is

---

[9] Since we conclude that some of the defendants' activities probably constituted violations of the State Antitrust Act, we need not reach the Commonwealth's claims that these activities were also violations of the Massachusetts Consumer Protection Act as raised in its amended complaint. See G. L. c. 93A, §§ 1-11. Nor do we reach all the issues raised relative to the alleged violations of the bottle bill. See G. L. c. 94, §§ 321-327.

[10] Federal courts have interpreted *Hecht Co.* v. *Bowles, supra,* to mean that when a government agency acts under its own authority to restrain statutory violations, a demonstration of irreparable harm is not a prerequisite to injunctive

not required to demonstrate irreparable harm concerning those activities of the defendants which probably resulted in violations of our General Laws and which may adversely affect the public interest. See *Hecht Co.* v. *Bowles, supra.*

2. *The Antitrust Act (G. L. c. 93, §§ 1-14A) and bottle bill violations (G. L. c. 94, §§ 321-327).* a. *Exemption claims under the Antitrust Act.* The defendants claim that a provision of the Massachusetts antitrust statute exempts any activities involving the bottle bill from scrutiny under the State antitrust laws. General Laws c. 93, § 7, inserted by St. 1978, c. 459, § 1, provides, in part, that the act shall not apply to "[a]ny activities which are exempt from any of the federal antitrust laws . . . or . . . [a]ny activities which are subject to regulation or supervision by state . . . agencies." Because the act states that Federal case law must guide the interpretation of the State act, G. L. c. 93, § 1, and since Massachusetts courts have not had occasion to analyze this act, a review of Federal law on the exemption issue is helpful in analysis of State law. The United States Supreme Court has held that the Federal Antitrust Act confers no express immunity, that implied repeals of the Act from a regulatory statute are disfavored, and that such repeals are found only in cases where a patent repugnancy exists between the antitrust activity and regulatory laws. *Otter Tail Power Co.* v. *United States,* 410 U.S. 366, 372 (1973), and cases cited. Two restrictive standards have been enunciated by the Court to determine whether antitrust immunity exists in a specific case. "First, the challenged restraint must

relief since the likelihood of a statutory violation implies that the public interest is adversely affected. See *Commodity Futures Trading Comm'n* v. *Muller,* 570 F.2d 1296, 1300 (5th Cir. 1978); *SEC* v. *Management Dynamics, Inc.,* 515 F.2d 801, 808-809 (2d Cir. 1975). State courts also have held that an injunction should issue where a State agency which is authorized to restrain violations of laws has shown the existence of such a violation, and that irreparable injury need not be demonstrated as a separate prerequisite to relief. See *Arizona State Bd. of Dental Examiners* v. *Hyder,* 114 Ariz. 544, 546 (1977). Cf. *Independent School Dist. No. 9 of Tulsa County* v. *Glass,* 639 P.2d 1233, 1237 (Okla. 1982) (case involved denial of permanent injunction); *Semke* v. *State ex rel. Okla. Motor Vehicle Comm'n,* 465 P.2d 441, 445 (Okla. 1970) (case involved granting of preliminary injunction).

be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980). See *Parker* v. *Brown,* 317 U.S. 341, 350-351 (1943). See also Woocher & Manoff, The Massachusetts Antitrust Act — A Guide for the Private Practitioner, 3 W. New Eng. L. Rev. 11, 24 (No. 1, 1980).

The defendants' contention that their activities require exemption under the State Antitrust Act is not persuasive. The allegedly unlawful trade practices charged by the Attorney General are not the collection or refunding activities mandated by the bottle bill. The defendants' methods of operation and their fees paid to CRINC are not pursuant to the statutory requirements of the bottle bill. See G. L. c. 94, §§ 322-323. Nor are the defendants' actions mandated by State regulation. 301 Code Mass. Regs. § 4.05(2), (4) (1983).

The defendants also claim that their activities involving malt beverages should be exempt from antitrust scrutiny based on § 2 of the Twenty-first Amendment to the United States Constitution, which accords the State considerable regulatory power over alcoholic liquors within its boundaries. See also G. L. c. 138, § 24 (Alcoholic Beverages Control Commission may regulate conduct of liquor licensee's business). We note that the Supreme Court has stated that liquor companies may be liable for anticompetitive conduct not mandated by a State. *California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc., supra* at 109. *Joseph E. Seagram & Sons* v. *Hostetter,* 384 U.S. 35, 45-46 (1966). Here, again, the challenged practices of the defendants do not involve any State policy concerning the sale of alcoholic beverages or any other regulation mandated by the Alcoholic Beverages Control Commission. Compare *M.H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n,* 386 Mass. 64, 73 (1982) (commission's regulatory scheme of price control, articulating strong policy against price discrimination in sale of alcoholic beverages, and effectuated through State approval of sales price different from approved prices, results in implied exemption of pricing policy from Fed-

eral Antitrust Act). The activities of these defendants are not exempt from scrutiny under G. L. c. 93, §§ 1-14A.

We now turn to evaluate whether the Superior Court judge properly issued an injunction based on any of the allegedly unlawful activities engaged in by the defendants.

b. *Commingling fees and mother carton deposits.* The Commonwealth claims that the defendant CRINC has engaged in price-fixing which is considered an unreasonable restraint on trade under the State Antitrust Act. See G. L. c. 93, § 4. Federal courts consistently have held that an agreement among competitors to raise, depress, stabilize, or fix the price of goods in commerce is illegal per se. *United States* v. *Socony-Vacuum Oil Co.,* 310 U.S. 150, 223 (1940). *Catalano, Inc.* v. *Target Sales, Inc.,* 446 U.S. 643, 647 (1980). See 15 U.S.C. § 1 (1976). Based on its belief that any price-fixing "directly interfer[es] with the free play of market forces," the United States Supreme Court has imposed the strict per se rule and has not inquired into the reasonableness of the trade restraint.[11] See *United States* v. *Socony-Vacuum Oil Co., supra* at 221; *United States* v. *Sealy, Inc.,* 388 U.S. 350, 355 (1967).

The Court has also recognized untraditional methods of price-fixing as equally violative of the per se rule. In *Catalano, Inc.* v. *Target Sales, Inc., supra* at 650, the Court decided that an unlawful price-fixing arrangement resulted from an agreement among competing liquor wholesalers to eliminate credit terms in their sales to retailers. The *Catalano* Court also reaffirmed the rule that a horizontal price-fixing agreement among competitors patently restricts trade and lacks any redeeming features.[12]

---

[11] By contrast, the Court has applied a rule of reason to evaluate the legality of other types of trade restraints under § 1 of the Sherman Act (15 U.S.C.). Under this standard, "[t]he true test of legality is whether the restraint imposed . . . merely regulates and perhaps thereby promotes competition or whether it . . . may suppress or even destroy competition." *National Soc'y of Professional Eng'rs* v. *United States,* 435 U.S. 679, 691 (1978), quoting *Chicago Bd. of Trade* v. *United States,* 246 U.S. 231, 238 (1918).

[12] See *United States* v. *Socony-Vacuum Oil Co., supra* at 224 (competitors' agreement to engage in buying of surplus gasoline in spot market to escalate

Although the defendant distributors are not primarily in the container recovery business, the bottle bill requires them to enter the new competitive market for collecting and processing returnable containers. Not only does the bottle bill enable any individual to operate a redemption center but the statute also imposes on distributors the primary responsibility for accepting containers sold by them. Redemption centers and beer distributors now have a common interest in collecting returnable beer containers; yet the former are in business to realize a profit in a new industry while distributors seek to fulfil their statutory obligations in the most cost efficient manner to avoid impairing their existing businesses.

There is uncontroverted evidence that the defendants agreed to deduct from the mandated two-cents handling fee required by G. L. c. 94, § 323 (*c*), and 301 Code Mass. Regs. § 4.05 (2), (4) (1983), a charge of three quarters of a cent for each returnable can commingled with containers of other brand distributors.[13] The commingling charge could be characterized as a price set by CRINC and the defendants to reflect the additional cost of collecting and processing commingled containers. Thus construed, the uniform charge constitutes an unlawful agreement under the per se rule. The defendants, competitors in the container recovery market, have fixed the amount of a particular business expense charged to customers, instead of permitting its cost to be determined by market forces. See *Catalano, Inc.* v. *Target Sales, Inc., supra*. The Commonwealth has shown a likelihood of succeeding on this portion of the price-fixing charge. The reasons presented by the defendants to justify the commingling charge are irrelevant under the per se standard.

and maintain product's market price constitutes unlawful price-fixing under per se rule); *National Soc'y of Professional Eng'rs* v. *United States, supra* at 692-693 (per se unlawful price-fixing occurred when competing engineers agreed to refuse discussing prices until after potential customers selected engineer for project).

[13] Although the record shows that the defendants ceased imposing the commingling charge as of June 2, 1983, this would not preclude the judge from enjoining any subsequent charges of this sort. In addition, the chairman of CRINC stated, in an affidavit, that CRINC would continue to monitor commingling and to reimpose the charges if the amount of commingled cans substantially increased.

Similarly, the defendants' concerted decision to charge dealers fixed amounts for recycling bags and for deposits on trays and mother cartons could be considered unlawful price-fixing. Again, the defendants' decision arbitrarily to fix the costs of these items prevents the operation of the new container recovery market from determining their value. Cf. *Catalano, Inc.* v. *Target Sales, Inc., supra* at 649-650.

The commingling fees and deposits charged to dealers also enabled the Commonwealth to show a likelihood of prevailing on claims that such charges violated the bottle bill's mandate that distributors pay dealers a handling fee of at least two cents a container. See G. L. c. 94, § 323 (*c*) (fee mandated if containers presented at time and place of delivery of filled containers).

The regulations promulgated to effectuate the purposes of the statute also provide that acceptance of beverage containers "shall be the responsibility and expense of distributors," and should "not be made less convenient . . . for dealers than acceptance at the time of delivery of filled containers." 301 Code Mass. Regs. § 4.05 (2) (1983). By requiring dealers to use only CRINC authorized receptacles or shells to return the containers, and to pay either a fixed amount for these receptacles or a fixed deposit on the mother cartons, the defendants appear to have violated this regulation. The judge would be warranted in concluding that these charges and restrictions not only impose the expense of returning containers on dealers but also make this activity less convenient to dealers than acceptance at the time of delivery of filled containers.

The judge also could have correctly concluded that these probable violations of the bottle bill did not promote the public interest. The unlawful fixing of prices could defeat the objectives of both the State Antitrust Act and the bottle bill by preventing the reduction of costs, beneficial to consumers, which results from a competitive pricing of beer in the marketplace. Specifically, beer prices could continue to escalate as a result of CRINC's set fees for services and fixed charges

assessed against dealers.[14] Any additional inconvenience in recycling imposed on dealers in contravention of the bottle bill also could serve to undermine the statute's environmental objectives.

The judge's order therefore properly enjoined the defendants from charging a deposit for mother cartons, or deducting a portion of the dealers' handling fees for commingling containers. However, we vacate the portion of the order which enjoins CRINC from charging dealers any fees for recycling receptacles provided by CRINC. Dealers cannot be required to use only CRINC authorized receptacles, yet CRINC is entitled to charge dealers if they choose to use the recycling bags purchased by CRINC.[15] The defendant distributors, however, are competitors, and thus they may not collaborate on prices that they will charge for receptacles. See G. L. c. 93, § 4.

c. *Container collection schedules.* By requiring dealers to comply initially with CRINC's pick-up schedule, or be charged for an additional pick-up, the defendants have ignored the regulations prescribing that acceptance of containers "shall be the responsibility and expense of distributors" and should "not be made less convenient . . . for dealers than acceptance at the time of delivery of filled containers." 301 Code Mass. Regs. § 4.05(2) (1983). See G. L. c. 94, § 326. The judge

---

[14] The evidence showed that a portion of the defendants' increased beer prices in January, 1983, reflected the costs they incurred in operating CRINC. The harm to consumers in paying the increased prices would appear, as a practical matter, to be incapable of remediation through money damages, given the decision of the Supreme Court in *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720 (1977). The Court refused to allow indirect purchasers to sustain a treble damages claim against the defendants, although the direct customers of the defendants could seek monetary relief from the defendants' unlawful activities in restraint of trade. *Id.* at 730-731. See 15 U.S.C. § 15 (1976). The Court recognized that limiting relief under the treble damages provision to direct purchasers could preclude deserving indirect customers from showing actual damages suffered from an unlawful price overcharge. *Id.* at 731 n.11.

[15] CRINC is currently providing the recycling bags to dealers at a small loss, since it charges only the price which CRINC paid for them, without adding on handling and shipping charges. The additional cost to CRINC, each month, of supplying these receptacles free of charge would total $16,875.

could have concluded that the restrictive collection schedule and the additional charges on dealers have made container collection less convenient for dealers than accepting delivery of filled containers.[16]

The public interest could be adversely affected by these violations of the regulatory scheme. Higher retail prices of beer and perhaps other beverages could result from the additional charges imposed by CRINC on dealers. The wasting of retail shop space for a period of days to store empty containers could result in decreased sales volume. Moreover, less efficient and effective redemption and sales service to consumers may result, thereby diminishing the public's incentive to return beer containers and stultifying the environmental objectives of the bill. The likely existence of the bottle bill violations and the

---

[16] There exists a substantial factual dispute concerning the efficiency and convenience of CRINC's pick-up services which is not resolved entirely by the conflicting affidavits presented by the parties. The bulk of the Commonwealth's evidence is in the form of "John Doe" dealer reports to investigators for the Attorney General. The defendants' evidence is comprised of personal affidavits from numerous dealers who have done business with CRINC and have expressed satisfaction with the collection service. While there is support in the record for a finding that the CRINC schedule makes it less convenient for some dealers, the judge, on remand, may deem it appropriate to take evidence on the question before entering any final orders on this point. See *SEC* v. *Frank*, 388 F.2d 486, 491 (2d Cir. 1968) (where sharp dispute exists as to crucial facts, judge should conduct hearing to illuminate factual issues and not order injunction based on affidavits); *Sims* v. *Greene*, 161 F.2d 87, 88 (3d Cir. 1947) (conflicts in allegations of affidavits and pleadings on motion for injunctive relief should be resolved by oral testimony). Cf. *Ross-Whitney Corp.* v. *Smith Kline & French Laboratories*, 207 F.2d 190, 195, 198 (9th Cir. 1953) (preliminary injunction may be granted solely on affidavits, at least where no dispute concerning basic facts). We uphold the preliminary injunction since there is an adequate showing of a violation of the regulation issued pursuant to the statute. See *FTC* v. *Rhodes Pharmacal Co.*, 191 F.2d 744, 747-748 (7th Cir. 1951) (where injunction authorized by statute, court need only find justifiable basis to believe statute violated; injunction thus may issue on affidavits which do not resolve factual issues). Thus, in any further evidentiary hearing on this issue, the defendants would have the burden of proving that CRINC's collection schedule did not make container recovery less convenient for dealers than acceptance at the time of delivery of filled containers. Cf. *Wheeler* v. *Director of the Div. of Employment Sec.*, 347 Mass. 730, 734 (1964) (burden of proof on party alleging that he was within statutory exemption).

detrimental effects on consumers warranted the portion of the order enjoining the defendants from requiring dealers to comply with CRINC's collection schedule. The judge's order contemplates, in accordance with the regulation, that another pickup time designated by the dealer as equally convenient, may be set by agreement. We conclude that the preliminary injunction on this point should be affirmed.

3. *Vacating portions of the order*. In the remainder of his order, the judge did not evaluate correctly the Attorney General's likelihood of success on the merits of the various legal claims. The judge also neglected specifically to determine how the defendants' activities would affect the public interest.

a. *The judge erred in enjoining the defendants from requiring designated dealers to return containers only to CRINC and from refusing to deal with any third person offering services on the same or better terms as CRINC*. This portion of the order was based on the judge's findings that there existed a substantial likelihood that the defendants unlawfully foreclosed the entry of others into the container recovery market.[17] See G. L. c. 93, § 4. A logical reading of the record, however, does not support the conclusion that CRINC foreclosed potential participants from this new market. The defendants presented much evidence supporting their claim that CRINC did not foreclose competition in the container recovery market. CRINC advertisements, as well as notes from an early meeting of CRINC participants, stated that the company would pick up from redemption centers at which consumers returned their beer containers. Several defendants similarly attested in their affidavits. The defendants also amassed numerous affidavits signed by owners of redemption centers who stated that CRINC continually had picked up their containers.

By contrast, the Commonwealth submitted three hearsay affidavits of owners of redemption centers who stated that

---

[17] An agreement between competitors to refuse to deal with other traders consistently has been regarded as an unreasonable restraint on trade under the per se rule. See *Silver* v. *New York Stock Exch.*, 373 U.S. 341, 347 (1963); *Klor's Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959); 15 U.S.C. §§ 1, 2 (1976); G. L. c. 93, § 4.

CRINC employees had indicated that the company would not do business with them.

The record thus appears to support the defendants' contention that CRINC's activities did not foreclose any actual or potential competitor from the container recovery market.[18] Although CRINC chose not to execute its standard three-year service contract with redemption centers, the company appeared willing to pick up their containers on a regular basis.[19] Since the judge concluded incorrectly that the defendants unlawfully foreclosed actual or prospective competitors from participating in the container recovery market, we vacate this portion of his order.

b. *The judge erroneously enjoined the defendants from paying to CRINC any amounts due the company unless the defendants make available to their designated dealers and to any third person (or redemption·center) the same uniform schedule of fees and times of payment.* The judge sought to prohibit the defendants from precluding any other market entrant from taking advantage of CRINC's fees and charges. As discussed previously, the record does not support the judge's conclusion that CRINC foreclosed actual or potential redemption concerns from participation in the Commonwealth's container recovery market. Unlike the commingling fees and deposit charges imposed on dealers, the uniform fees which the defendant distributors paid CRINC for its services probably would not be construed as unlawfully fixed prices. Compare *Catalano, Inc.*

---

[18] There is therefore insufficient evidence to support the Commonwealth's claim that the defendants monopolized, or attempted or conspired to monopolize, the beverage container recovery market in this regard. See *United States* v. *Grinnell Corp.*, 384 U.S. 563, 576 (1966) (challenged business conduct must be shown to impair opportunities of competitors in relevant market); 3 P. Areeda & D. Turner, Antitrust Law par. 625, at 72 (1978) (unlawful monopoly exists if defendant has power to control prices or unreasonably restrict competition in any part of trade or commerce).

[19] Furthermore, even assuming, as some evidence demonstrated, that CRINC may have refused to pick up from redemption centers any brands which their clients (the defendants and the non-shareholder distributors) did not sell, under the bottle bill the defendants were obligated only to accept returns of the type, size, and brand that they sold during the past sixty days. Redemption centers would have to return the other types, sizes, and brands to distributors who were required under the law to accept them. See G. L. c. 94, § 323 (*e*).

v. *Target Sales, Inc.*, 446 U.S. 643, 650 (1980) (unlawful price-fixing results from wholesalers' agreement to sell to retailers on cash basis only and to eliminate practice of credit sales). Such fees amounted to a decision by the defendant shareholders on how to pay for the costs of operating CRINC. The Commonwealth thus probably would not prevail on the merits of an antitrust action charging that such fees constituted unlawful price-fixing.

c. *The judge erroneously ordered that CRINC must pay all deposits and handling fees either immediately or within fifteen days after collecting returnable containers. Similarly, the judge should not have enjoined CRINC from increasing the fees paid for its services.* The Commonwealth did not show that any provision of the bottle bill requires distributors to pay dealers their handling fees and deposits within a particular time period following collection. See G. L. c. 94, § 323 (*c*)-(*e*).

The defendants have shown that CRINC could not tolerate financially remitting all deposits and handling fees to dealers within fifteen days of collection. CRINC was operating at a net loss of $1,902,943. Based on annual collection figures, the defendants calculated that the total amount of deposits and fees for the first half of one month would approximate $1,890,000. The amount of money that CRINC would have to borrow to pay dealers within fifteen days, plus interest and additional processing and labor expenses, amounts to an additional annual expenditure of $144,000.

In accordance with its current practice, CRINC may continue, on the fifteenth of each month, to remit the monies due dealers under the bottle bill from collection completed during the previous month.

Additionally, there appears no justification for an injunction barring CRINC from raising its current service fees payable by its distributor clients, absent a specific statutory violation. No such violation is shown on this record.

4. *Conclusion.* We conclude that the judge's order of April 29, 1983, is affirmed in part, modified in part, and vacated in part.

To summarize, the judge's order is vacated and modified as follows: CRINC is not to be enjoined from charging dealers a price for using CRINC authorized recycling receptacles. If dealers choose to use CRINC recycling bags, CRINC may charge the dealers a price for using these receptacles. The defendant distributors, as competitors, cannot collaborate on prices to be charged for receptacles.

Also, the following portions of the judge's order shall be vacated: (a) enjoining the defendants from requiring dealers to return containers only to CRINC and from refusing to deal with any third person on the same terms as CRINC; (b) enjoining the defendants from paying CRINC any fees unless the same uniform fee and payment schedules are made available to any third person (or redemption center), or any designated dealer doing business directly with CRINC; (c) ordering defendant CRINC to pay all deposits and handling fees either immediately or within fifteen days after collecting returnable containers; (d) enjoining defendant CRINC from raising its current service fees payable by its distributor clients, absent a showing of a specific statutory violation.

Otherwise, we affirm the judge's order, including the portions: (a) enjoining the defendants from charging dealers a deposit for original, or mother cartons and enjoining CRINC from deducting a portion of the dealers' handling fees for commingling cans; (b) enjoining the defendants from requiring dealers to comply with CRINC's collection schedule.

*So ordered.*