Gants, Ralph D., J.
On February 25, 2008, this Court, after making findings of fact and conclusions of law on the Commonwealth’s motion for a preliminary injunction, issued a preliminary injunction [23 Mass. L. Rptr. 567] ordering the defendant Fremont Investment & Loan (“Fremont” or the “Bank”) as follows:
1. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont that is (a) NOT presumptively unfair, because it does not possess each of the four characteristics identified above, or (b) NOT secured by the borrower’s principal dwelling, or (c) that is secured by a dwelling that is vacant or uninhabitable, Fremont shall first give the Attorney General 30 days advance written notice so that the Attorney General can verify that the proposed foreclosure falls outside the scope of this Preliminary Injunction. If the Attorney General has not given written notice of an objection to Fremont by the 30th day, based on her finding that the loan is presumptively unfair and is secured by the *13 borrower’s principal dwelling and that the dwelling is both inhabited and inhabitable, Fremont may proceed with the foreclosure. If the Attorney General has given written notice of an objection, Fremont shall proceed in accordance with paragraph 2 below.
2. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont (1) (a) that is presumptively unfair, because it possesses each of the four characteristics identified above, and (b) secured by the borrower’s principal dwelling, and (c) where the dwelling is neither vacant nor uninhabitable, or (2) in which the Attorney General has provided a written objection in accordance with paragraph 1 above, Fremont shall give the Attorney General 45 days advance written notice of the proposed foreclosure, identifying the reasons why foreclosure is reasonable under the circumstances and/or why the Attorney General’s written objection under paragraph 1 above is in error. If the Attorney General has not given written notice of an objection to Fremont by the 45th day, Fremont may proceed with the foreclosure.
3. If the Attorney General has timely given a written objection under paragraph 2 above, the Attorney General and Fremont shall within the next 15 days attempt to resolve their differences regarding the foreclosure. If these differences have been resolved, the Attorney General will notify Fremont in writing that she has withdrawn her written objection. If these differences are not resolved, Fremont may proceed with the foreclosure only with the prior approval of this Court (or a special master appointed by this Court), which it may seek on the 16th day.
4. In considering whether to approve the foreclosure, this Court will determine (a) whether the loan is actually unfair and is actually secured by the borrower’s primary residence that is both inhabited and inhabitable, (b) whether Fremont has taken reasonable steps to “work out” the loan and avoid foreclosure, and (c) whether there is any fair or reasonable alternative to foreclosure. This Court will seek to expedite these decisions but, if the number of such matters grows too large, this Court may need to appoint a special master to assist the Court.
Findings of Fact and Conclusions of Law on Plaintiffs Motion for a Preliminary Injunction (“Preliminary Injunction Decision”) at pp. 28-29.
On March 20, 2008, Fremont issued a press release announcing that it had entered into an Asset Purchase Agreement (“the Agreement”) with Carrington Mortgage Services, LLC (“Carrington”) to sell Fremont’s rights to service mortgage loans currently owned by certain securitization trusts sponsored by Carrington’s corporate parent. Under this Agreement, roughly 300 of the 2,200 mortgage loans in Massachusetts that are currently being serviced by Fremont (but are not owned by Fremont) will be sold to Carrington upon the scheduled closing on April 1, 2008. The Agreement provides that Carrington will perform the Assumed Liabilities, but those Assumed Liabilities as defined in the Agreement include only those arising from any “action, event, obligation, circumstance or condition occurring or existing after the Closing Date” of April 1, 2008. Agreement at §§1.1 & 2.3. The Agreement takes pains to add, “For the avoidance of doubt, [Carrington] will not assume or have any Liability or responsibility with respect to any Liability of any nature or kind whatsoever relating to [Fremont’s] business or the Purchased Assets that exist or arises out of the operation or ownership of [Fremont’s] business or the Purchased Assets prior to the closing . . .” Agreement at §2.3. In short, under this Agreement, Carrington expressly does not agree to accept the obligations imposed upon Fremont with regard to these loans under this Court’s February 25, 2008 preliminary injunction.
When the Commonwealth learned of this Agreement, the Commonwealth promptly moved to modify the preliminary injunction to prevent Fremont from assigning the ownership rights or servicing obligations of the mortgage loans governed by this preliminary injunction unless the obligations of the Court’s Order were assigned with these loans and the assignee agreed to accept those obligations. After hearing, the Commonwealth’s motion for a modification of the preliminary injunction is ALLOWED in part.
DISCUSSION
Fremont correctly observes that the Attorney General asked this Court in her initial motion to enjoin the assignment of Fremont’s Massachusetts loans, and this Court chose not to include such a prohibition in its preliminary injunction. While this Court did not wish to prohibit Fremont from exiting the subprime mortgage business, which Fremont had said was its plan, this Court did not anticipate that Fremont would think that, without prior court approval, it could assign any of the loans covered by the preliminary injunction without making any such assignment subject to the obligations in the preliminary injunction, that is, without assigning those obligations along with the loans. This Court plainly erred in failing to anticipate that possibility.
The Court’s failure to anticipate this possibility, however, is of little consequence for two reasons. First, no closing has yet occurred with respect to the assignment of any of these loans, so this Court still has the opportunity to prevent any such assignment if it finds it appropriate to do so. Second, it is of no legal consequence whether the Commonwealth moves to modify the preliminary injunction to prohibit any such assignment (as it has done), or if Fremont moves to clarify the preliminary inj unction to ensure that it does not bar such an assignment (which it did not do), since *14 the legal standard for considering either motion is the same. As the Commonwealth correctly observes, in considering whether to modify a preliminary injunction issued under G.L.c. 93A, §4, this Court, having already determined that the Commonwealth is likely to prevail, should focus on whether the grant of the modified relief will promote or adversely affect the public interest. G.L.c. 93A, §4; Commonwealth v. Mass. CRINC, 392 Mass. 79, 89-90 (1984).
In all but the most unusual circumstances, this Court agrees with the Commonwealth that the modification it seeks is necessary to prevent Fremont from escaping the obligations imposed under the preliminary injunction by assigning these loans or the servicing rights to these loans to third parties without also expressly requiring those third parties to abide by those obligations. Without the requested modification, Fremont could simply sell those loans or servicing rights to third parties as if the preliminary injunction did not exist, because the assignment need not require the assignee to agree to be bound by the obligations in the preliminary injunction. This Court cannot permit so simple an “end run” around its orders.[1]
Fremont argues that, pragmatically, if this Court were to require any assignee to accept the obligations of the preliminary injunction, the effect of such a requirement would be to prohibit any assignment of these loans or servicing rights, because no mortgage institution would agree to an assignment carrying that “baggage.” This Court does not find Fremont’s reasoning persuasive. While Fremont for purposes of its interlocutory appeal may wish to characterize this Court’s preliminary injunction as extraordinarily burdensome, perhaps even draconian, it is expressly intended to be rather modest in its scope. Indeed, this Court notes that in many ways the relief granted by the Court is narrower in scope than the Term Sheet letter agreement that Fremont voluntarily entered into with the Attorney General on July 10, 2007. The spirit of the preliminary injunction, as this Court expressly noted in its decision, is that “Fremont, having helped borrowers get into this mess, now must take reasonable steps to help them get out of it.” Preliminary Injunction Decision at 28. All that the preliminary injunction does is ensure that Fremont take all reasonable steps to help borrowers avoid foreclosure on unfair loans it issued, and explore fair and reasonable alternatives to foreclosure. Id. at 28-29. If Fremont has taken such reasonable steps (which Fremont contends it routinely takes), then this Court will approve the foreclosure.
It is noteworthy that Fremont has chosen not to test the procedure the Court put in place — since the issuance of the Preliminary Injunction Decision, Fremont has failed to notify the Attorney General of its intent to proceed with any foreclosure of a Massachusetts loan. This Court is confident that, if Fremont were to employ the procedure rather than rail against it, it would find that the procedure is far from onerous. If it turns out to be onerous, this Court will modify it as needed. Consequently, while this Court understands that third parties may be wary of purchasing loans or servicing obligations that require them to accept the obligations in the Preliminary Injunction Decision, this Court is confident that they will be increasingly willing to do so once they see that the obligations are eminently workable.
To be sure, assignees may require Fremont to discount the price for these loans or servicing rights to induce them to accept these obligations with the assignment, but that discount is simply the price that Fremont must pay for having entered into the unfair loans in the first place. Therefore, when Fremont argues that it will be unable to assign its loans or servicing rights if the assignee were required to accept the obligations in the preliminaiy injunction, all that it credibly says is that (1) potential assignees will be wary of the burden imposed by these obligations, a wariness that is greater because of their uncertainty as to how these obligations will be applied in practice, and (2) it will receive less for these assignments than it otherwise would because assignees will demand a discounted price in return for accepting these obligations. The first concern will diminish over time, when all will see that the obligations are less burdensome in practice than feared. The second concern is simply the unhappy consequence that Fremont deserves for having unfairly issued loans that borrowers could not be expected to afford if they could not refinance.[2]
Therefore, if there were not unusual circumstances, this Court would simply modify the preliminary injunction as requested by the Attorney General and enjoin the closing on the Agreement with Carrington unless the Agreement were modified so that Carring-ton agreed to abide by the procedure in the preliminary injunction. There are, however, unusual circumstances in this case — on March 26, 2008, the Federal Deposit Insurance Corporation issued a Supervisory Prompt Corrective Action Directive against Fremont (“the FDIC Directive”). The FDIC Directive observes that, in a letter dated May 24, 2007, the FDIC notified Fremont that it was undercapitalized and required Fremont to submit an acceptable capital restoration plan by July 9, 2007. The plan submitted by Fremont on August 9, 2007 was found unacceptable by the FDIC. Fremont submitted a revised capital restoration plan on November 9, 2007, but Fremont stated the plan was obsolete on March 17, 2008. Since Fremont had failed to submit an acceptable capital restoration plan and failed to comply with its capital maintenance provisions, and since the financial condition of its parent, Fremont General Corporation, continued to deteriorate, the FDIC ordered Fremont and/or its parent to take one of two alternative courses of action within 60 days: (1) either Fremont “shall sell enough voting shares or obligations of the Bank so that the Bank will be adequately capitalized after the sale *15 and/or” (2) Fremont shall accept an offer to be acquired by another bank and its corporate parents shall divest themselves of the Bank. FDIC Directive at 3.
Fremont contends that its sale to Carrington of the rights to service mortgage loans owned by Carrington is part of its effort to return to adequate capitalization mandated by the FDIC. Fremont observes that the Massachusetts loans comprise only a small fraction of the loans whose servicing rights are being sold, and that this sale is essential if Fremont is to meet the FDIC’s 60-day deadline. Fremont also notes that, if this Court were to enjoin the sale unless Carrington agreed to abide by the obligations in the preliminary injunction, the Asset Purchase Agreement could not close on April 1 and it is uncertain whether Carrington would agree to proceed with the sale at a later date, since Carrington took pains to include language in the Agreement making clear that the only liabilities it was assuming were those that arose after the closing. This Court preliminarily finds each of these assertions to be accurate. Therefore, this Court must deal with the probability that enjoining the sale of the 300 Massachusetts loans whose servicing rights would be sold under the terms of the Asset Purchase Agreement would prevent the Agreement from closing on April 1, and the significant possibility that this modification of the preliminary injunction may prevent this Agreement from closing within the 60-day deadline set by the FDIC.
The Attorney General and Fremont agree that, if Fremont were to fail to meet the conditions set by the FDIC Directive within the 60-day deadline, the almost certain result would be that the FDIC would place Fremont under FDIC receivership. Being placed under receivership would constitute an Event of Default under the Pooling and Service Agreements that govern the Carrington loans which Fremont is presently servicing, and that Default would permit the Trustee for these loans (which apparently is Deutsche Bank) to terminate all of Fremont’s rights to service these loans and transfer those servicing rights to another entity. Therefore, this Court must also deal with the possibility that, if it seeks to protect the 300 Massachusetts borrowers at issue by enj oining Fremont from entering into the Asset Purchase Agreement, it may increase the likelihood that Fremont would fall into receivership, which would result in the termination of its servicing rights over these Carrington loans, which would mean that these loans would ultimately be serviced by a third-party entity not governed by the preliminary injunction. In short, if this Court attempts to protect those 300 Massachusetts borrowers by enjoining the Carrington sale unless the Asset Purchase Agreement is revised to be subject to the preliminary injunction, the attempt may help to push Fremont into receivership and, by doing so, would fail to protect those Massachusetts borrowers.
As a result, this Court is left with two poor choices— enjoin Fremont from entering into the Asset Purchase Agreement and accept the risk that the preliminary injunction would ultimately still not help the 300 Massachusetts borrowers at issue if Fremont falls into receivership, or permit Fremont to proceed with the sale under the terms of the Agreement and allow the servicing rights to be assigned to a third party not bound by the preliminary injunction. This Court finds that the second poor alternative better protects the public interest, largely because this Court does not find it to be in the public interest for Fremont to fall into FDIC receivership, especially since a receivership would make it even more difficult to protect the interests of the remaining 2,200 borrowers whose loans Fremont will continue to own or service.[3]
While that painful balancing means that this Court will not enjoin the closing of the Asset Purchase Agreement with Carrington, it does not mean that this Court will not modify the preliminary injunction as requested by the Attorney General. Fremont has advised the Court that there are no other assignments on the cusp of being entered into that would affect the Massachusetts borrowers, so this Court is not faced with the same dilemma as to the other loans that it faces with the Carrington loans. While the public interest balancing of risks may tilt in favor of Fremont as to the Carrington loans, it tilts in favor of the Attorney General as to the remaining 300 loans that Fremont owns and the 1,900 loans that it services but does not own.[4] Therefore, this Court hereby modifies the preliminary injunction to add a fifth term to the four already in the preliminary injunction:
5. Pending final adjudication of this action or further order of this Court, Fremont shall not sell, transfer, or assign (i) any mortgage loan originated by Fremont that is secured by any residential property in Massachusetts, or (ii) the legal obligation to service any mortgage loan originated by Fremont that is secured by any residential property in Massachusetts, unless:
a. Fremont gives the Massachusetts Attorney General written notice of its intent to enter into such an assignment, including a copy of the proposed agreement, at least five business days before executing the purchase agreement,
b. the obligations of this Court’s Preliminary Injunction, including but not limited to this restriction upon further sale, transfer, or assignment, are also assigned with the sale or assignment of the loans or servicing rights,
c. the assignee agrees in the written assignment to be governed by the terms of the Preliminary Injunction and its obligations, and
d. a copy of the executed written assignment is provided within five business days of its execution to the Attorney General.
Notwithstanding this modification, Fremont is not enjoined from closing on the Asset Purchase Agreement entered into with Carrington on March 17, 2008, *16 provided this Agreement closes before May 25, 2008 (the 60-day deadline established in the FDIC Directive).
ORDER
For the reasons stated above, this Court hereby ALLOWS the Attorney General’s motion to modify the preliminary injunction to the extent that, pending final adjudication of this action or further order of this Court, this Court ORDERS as follows:
1. Pending final adjudication of this action or further order of this Court, Fremont shall not sell, transfer, or assign (i) any mortgage loan originated by Fremont that is secured by any residential property in Massachusetts, or (ii) the legal obligation to service any mortgage loan originated by Fremont that is secured by any residential property in Massachusetts, unless:
a. Fremont gives the Massachusetts Attorney General written notice of its intent to enter into such an assignment, including a copy of the proposed agreement, at least five business days before executing the purchase agreement,
b. the obligations of this Court’s Preliminary Injunction, including but not limited to this restriction upon further sale, transfer, or assignment, are also assigned with the sale or assignment of the loans or servicing rights,
c. the assignee agrees in the written assignment to be governed by the terms of the Preliminary Injunction and its obligations, and
d. a copy of the executed written assignment is provided within five business days of its execution to the Attorney General.
2. Notwithstanding this modification, Fremont is not enjoined from closing on the Asset Purchase Agreement entered into with Carrington on March 17, 2008, provided this Agreement closes before May 25, 2008.

 A11 parties agree that the servicing rights that Fremont exercises with respect to the loans it services but does not own give Fremont broad discretion in determining what should be done in the event the borrower defaults, including the power to waive, modify, or vary any term of the loan, postpone strict compliance with the terms of the loan, or grant an indulgence to the borrower. In effect, the servicer of the loan has essentially the same authority to “work-out” the loan as an owner of the loan would have had if it had not delegated the servicing of the loan.

 This Court also notes that the only persons who provided affidavits attesting to the impossibility of assigning these loans or servicing rights if they were subject to the preliminary injunction are Fremont’s own officers. The record contains no affidavit from any impartial expert in the mortgage industry.

 his Court’s balancing of interests in favor of allowing the Carrington sale to close is reinforced by a letter sent by Carrington this morning to the Attorney General which offers two proposals in keeping with the spirit (albeit not the letter) of this Court’s preliminary injunction. Those alternative proposals invite the Department of Banking or the Attorney General to vet Carrington’s foreclosure decisions before any foreclosure is instituted.

 This Court acknowledges the risk of confusion that arises from the fact that Fremont services 300 loans owned by Carrington and also owns 300 loans that it also services. The former 300 loans are being assigned to Carrington under the Asset Purchase Agreement: the latter 300 loans are not affected by the Agreement.