Chin, J.
This case arises out of a series of agreements entered into between the plaintiffs, Thomas E. Ticknor and CompuSoft Services, Inc., and the defendant, Micro Ink Systems Corp. The plaintiffs seek damages resulting from the defendant’s alleged breach of contract (Count I) and also seek various injunctive relief and declaratory orders (Count II). The defendant has filed a counterclaim alleging abuse of process (Count I), breach of contract (Count II), breach of a covenant restricting post-employment activities (Count III), defamation (Count IV) and conversion (Count V).
After jury-waived trial, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
1. On April 4, 1988, RAM Integrated Systems Corporation (RAM) and plaintiff CompuSoft Services, Inc. (CompuSoft) entered into a “Non-Exclusive WorldWide License Agreement” (the RAM Agreement) whereby CompuSoft obtained a license to distribute certain software products owned by RAM.
2. Clause 10 of the RAM Agreement provides, in pertinent part, that:
From time to time, [CompuSoft] may make modifications or improvements to the RAM Software Products. These software modifications will be considered the exclusive property of [CompuSoft]. [CompuSoft] may produce and/or license software products that integrate to RAM Software Packages. Any such software is the property of [CompuSoft] and shall in no way be construed as being a RAM Software Product.
Micro Ink assumed the obligation to pay license fees to RAM. The money was not to go to CompuSoft.
3. On September 1, 1988, CompuSoft and the defendant, Micro Ink Systems Corporation (Micro Ink), entered into an assignment agreement wherein CompuSoft assigned all of its “rights, title and interest” in the RAM Agreement to Micro Ink. In return, Micro Ink entered into an “Asset Purchase Agreement” and a “Key Employee Agreement” with CompuSoft and plaintiff, Thomas Ticknor (Ticknor), who was sole officer and director of CompuSoft. These agreements were entered into by Micro Ink’s president and treasurer, Robert Garfinkle (Garfinkle).
4. Under the Asset Purchase Agreement, Ticknor received 15% of the stock of Micro Ink. In April of 1989, Carol Anderson (Anderson) purchased the remaining 85% of the stock of Micro Ink from Garfinkle and became the new president of Micro Ink.
5. Pursuant to the Key Employee Agreement, Ticknor was to serve as vice president of Micro Ink. Section 21 of the Key Employment Agreement states:
The initial term of the Agreement shall be for the period of years set forth on Exhibit A... Thereafter, this agreement shall be automatically renewed for successive period of one year, unless you or the company shall give the other party not less than one month’s written notice of non-renewal. Your employment with the company may be terminated at any time as provided by Section 2.2.
Section 2.2 states:
The company shall have the right, on written notice to you, to terminate your employment:
(a) immediately at any time for cause; or
(b) at any time without cause, provided the company shall be obligated to pay you as severance pay an amount equal to six (6) month’s base salary . . .
6. Ticknor began employment with Micro Ink on September 1, 1988 for a term of two years ending August 31, 1990. In a letter dated July 27, 1991, Anderson notified Ticknor that his “current employment contract with Micro Ink expires on August 31, 1991,” and that Ticknor’s contract with Micro Ink would not be renewed. Ticknor resigned in writing from his employment as a Micro Ink employee on August 30, 1991.1 find that Ticknor is not entitled to any severance pay because Micro Ink exercised its right not to renew its employment agreement.
*551 7. According to the Key Employment Agreement, Ticknor’s base salary was $68,000.00 per annum at the rate of $5,066.67 per month. In 1989, Ticknor received from Micro Ink and reported as income salary of $65,053.23. In 1990, Ticknor received from Micro Ink and reported as income salary of $35,762.79. In 1991 Ticknor received from Micro Ink and reported as income salary of $21,455.76.
8.1 find that during the course of this employment contract, Ticknor was advised by Anderson that Micro Ink was having cash flow problems. Ticknor and Anderson met and agreed that Ticknor would receive approximately his net wages in the form of a so-called “loan to officer.” Apparently, this would result in a savings to Micro Ink because taxes and social security would not have to be paid on this money. Although termed as a “loan to officer," I find that there was no intent to have Ticknor repay these monies. Ticknor agreed to this scheme to allow the defendant to avoid paying taxes.
9. On September 1, 1988, CompuSoft, Micro Ink and Ticknor entered into an “Indemnification Agreement.” Section 1, entitled “Indemnity” provides in pertinent part:
Purchaser [Micro Ink] does hereby agree to indemnify and hold harmless Ticknor from all loss, cost, damage and expense (including reasonable attorneys’ fees) resulting from or relating to that certain guaranty of the obligations of RAM to the First Union Bank . . . “provided said indemnity shall not exceed one-third (V&) of the RAM indebtedness or $47,000.00, whichever is less . . .”
10. Although there was no documentary evidence submitted regarding payments made pursuant to Micro Ink’s agreement to indemnify Ticknor, Ticknor testified that the original amount of the loan was $47,000.00. Ticknor further testified that $28,000.00 was still owed on the loan as of June of 1991; however, there was no documentary evidence substantiating that figure. Micro Ink alleges that it paid $21,000.00 on account of the indebtedness to First Union Bank that it had agreed to indemnify Ticknor.
11. On August 30, 1991, Micro Ink and CompuSoft entered into an “Agreement for the Purchase of Programming and Consulting Services (Program Agreement). Pursuant to the Program Agreement, CompuSoft prepared program upgrades for products that had been covered by the RAM License Agreement marketed by Micro Ink under the trademarks ’’CONTROL" and “QP-CONTROL.” CompuSoft agreed to deliver the source code for these program upgrades to Micro Ink upon payment of an annual retainer fee to be paid in monthly payments. Micro Ink has failed to pay that fee.
12. Section seven of the Key Employee Agreement, entitled “Post Employment Activities,” provides in part that:
In the event of resignation, or termination without cause, for a period of one (1) year after the termination or expiration of the Agreement, whichever is longer, you will not directly or indirectly engage in activities similar or reasonably related to those in which you shall have engaged hereunder during the two years immediately preceding termination or expiration for, nor render services similar or reasonably related to those which you shall have rendered hereunder during such two years to, any person or entity whether now existing or hereafter established which directly competes with (or proposes or plans to directly compete with) the company (direct competitor) in any line of business engaged in or under development by the Company. Nor shall you entice, induce or encourage any of the Company’s other employees, to engage in any activity which were it done by you, would violate any provision of the Proprietary Information and Inventions Agreement or this Section 7. As used in this Section 7.1, the term “any line of business engaged in or under development by the Company” shall be applied at the date of termination of your employment.
RULINGS OF LAW
I. Plaintiffs’ Complaint
A. Count I — Breach of Contract
Plaintiffs allege that as a direct and proximate result of the breaches of contract by Micro Ink, Ticknor has sustained the following damages: (1) the balance of the debt due to First Union Bank in the amount of $29,000; (2) severance pay totaling $34,000; (3) unpaid wages totaling $35,000; and (4) any interest and penalties that may be assessed against Ticknor as a result of Micro Ink’s failure to pay payroll taxes.
1. Debt Due First Union Bank. “In an action for damages or other iype of reparation for a breach of contract, the plaintiff must allege and prove the making of the contract and the fact of breach.” 5A Corbin, Contracts §1230 at 511 (1964). In the instant case, while Ticknor testified that $28,000 was still due on the loan to the First Union Bank, he has failed to provide the court with any documentary evidence substantiating that amount. Micro Ink does allege payments of $21,000. Therefore, Micro Ink owes the plaintiff at least $26,000; however, plaintiff has failed to sustain his burden of proving that any further amounts are owed by Micro Ink on this loan. Waldo Bros. Company v. Platt Contracting Co., Inc., 305 Mass. 349, 359 (1940) (where a contract contains mutual and dependent covenants, the burden is on the plaintiff in an action for breach of contract to prove the contract and the compliance with his covenant in order to recover).
2. Severance Pay. It is a question of factual interpretation as to whether an employment contract is for a specific period actually agreed upon. 3A Corbin, Contracts §674, at 205-06; §684, at 226-27 (1964). At *552 bar, Section 2.2(b) of the Key Employment Agreement entitles Ticknor to severance pay only if he is terminated without cause. Micro Ink did not terminate Ticknor without cause; rather, it exercised its right under Section 2.1 of the Key Employment Agreement not to renew its employment contract with Ticknor. Therefore, as a matter of law, the provision of the Key Employment Agreement entitling Ticknor to severance pay does not apply.
3. Unpaid Wages. In the case at bar, Ticknor was a willing participant in a scheme that allowed Micro Ink to pay him his net wages while it avoided paying taxes and social security. Therefore, plaintiffs’ claim for unpaid wages is without merit.
4. Interest and Penalties. There is no evidence of any penalties or other payments that would be due to the Internal Revenue Service (IRS) as a result of the scheme entered into between the parties. In any event, any penalties or payments to the IRS would be due in part to Ticknor’s willing participation in this scheme.
5. Count II — Injunctive Relief. A preliminary injunction may issue where the moving party (1) has demonstrated that without the relief it would suffer irreparable harm, not capable of remediation by a final judgment in law or equity; (2) has demonstrated a likelihood that it would prevail on the merits of its claim at trial; and (3) has demonstrated that the risk of irreparable harm to it in light of its chances of success outweigh the defendant’s probable harm and likelihood of prevailing the case. Commonwealth v. Massachusetts CRINC, 392 Mass. 79, 87-88 (1984); Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
1. The plaintiffs first seek a preliminary and permanent injunction restraining Micro Ink from “marketing, selling, distributing, transferring, encumbering, servicing, soliciting for sale or otherwise using or disclosing the following:
(a) The Rapid RAM Systems Software products;
(b) RAM QP 1000 Software products, manuals and other related user documentation;
(c) Any and all duplicate diskettes or copies of the foregoing software products, manuals or documentation; and
(d) Any derivatives from (a), (b) and (c) above, including but not limited to the products known as “Micro Ink Control" and “QP Control”; and any manuals, other related use, documentation and duplicate diskettes or copies.
The Assignment Agreement into which the parties entered does not contain any provision providing for the retention of rights by the plaintiffs. Accordingly, this relief is denied. Id.
2. Second, plaintiffs seek a declaratory judgment declaring the assignment of distributors’ rights by CompuSoft to Micro Ink to be invalid and unenforceable. “A valid assignment may be made by any words or act which fairly indicate an intention to make the assignee the owner of a claim.” Kagan v. Wattendorf & Co. Inc., 294 Mass. 588, 596 (1936), quoting Cosmopolitan Trust Co. v. Leonard Watch Co., 249 Mass. 14, 19 (1924). The court finds that the Assignment Agreement at issue is valid and supported by adequate consideration. Id.
3. Third, plaintiffs seek a declaratory judgment “declaring that all non-competition, non-disclosure and proprietary agreements signed by the plaintiffs in favor of the defendant [sic]. ” The court finds this prayer makes no sense and is an apparent typographical error.
4. Fourth, plaintiffs seek an order requiring Micro Ink to revise its internal bookkeeping and financial records to reflect that payments made to Ticknor were salary payments and not a loan to him under a so-called loan to officer arrangement. Further, plaintiffs seek an injunction requiring Micro Ink to notify the IRS and Massachusetts Department of Revenue (DOR) of this proposed revision.
The court finds that the parties willingly entered into a scheme to avoid paying taxes to the IRS and DOR; therefore, it will not intervene in an attempt to rectify this situation.
5. The court holds that in regards to the plaintiffs’ fifth prayer seeking judgment against Micro Ink in the amount of $14,842.93, plus such other damages as may be proven at the time of trial, the plaintiffs are entitled to such a judgment, as this figure represents work done by Ticknor pursuant to the Agreement for the purchase of programming and consulting services.
6. Sixth, the plaintiffs seek an order requiring Micro Ink to provide an accounting of license fees due on all sales of the products covered by the Assignment Agreement and a judgment in the full amount of such license fees. For the reasons set forth above, the court holds that plaintiffs have failed to sustain their burden of proof on this issue and, as a result, their requested order is denied.
7. Prayer seven seeks a judgment in favor of Ticknor in the amount of: (a) $29,000, representing the debt owed to First Union Bank; (b) $34,000, representing severance pay; and (c) $35,000, representing unpaid salary.
Based upon the findings and rulings set forth in this opinion: (a) Ticknor has failed to sustain his burden of proving that any further amounts are owed by Micro Ink on this loan; however, Micro Ink owes Ticknor $26,000; (b) Ticknor is not entitled to severance pay; and (c) Ticknor is not entitled to unpaid salary.
II. Defendant’s Counterclaim
A. Count I — G.L.c. 231, §6E, 6F, 6G
To prevail on an abuse of process claim, “it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or *553 intended, or which was not the legitimate purpose of the particular process employed.” Beecy v. Pucciarelli, 387 Mass. 589, 595 (1892), quoting Quaranto v. Silverman, 345 Mass. 423, 426 (1963). The essential elements of the tort are “(1) ‘process’ was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.” Jones v. Brockton Pub. Mkts. Inc., 369 Mass. 387, 389 (1975); see also Datacomm Interfuel, Inc. v. Computerworld, Inc.: Adelson, 396 Mass. 760, 775-76 (1986); Stromberg v. Costello, 456 F.Supp. 848, 849 (D.Mass. 1978). At bar, the plaintiffs used the relevant process for the exact purpose for which it was designed, litigating the rights of the parties with respect to the agreements entered into between Compusoft, Ticknor and Micro Ink. The court does not agree with the defendant that this was a frivolous claim.
B.Count II — Breach of Contract
“When . . . the words [of a contract] are plain and free from ambiguity they must be construed in their usual and ordinary sense . . . [the contract] must be entered according to its terms.” Sherman v. Employer’s Liab. Assur. Corp., 343 Mass. 354, 356 (1961); Larabee v. Potvin Lumber Co., 390 Mass. 636, 641 (1983). In the instant case, Micro Ink alleges that “plaintiffs have failed or refused to provide the completed projects as agreed to Micro Ink thereby breaching its contract to Micro Ink." Pursuant to the Program Agreement, CompuSoft agreed to provide the completed projects to Micro Ink “upon payment of an annual retainer fee.” Micro Ink has not paid for that fee and therefore its claim is without merit. Id.
C.Count III — Post Employment Activities
It is well settled law that a provision in an employment contract restricting an employee’s ability to compete following the conclusion of his contract is not illegal per se or a restraint of trade. Blackwell v. E.M. Heldes, Jr., Inc., 368 Mass. 225, 228 (1975), citing to Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355, 358 (1933). “[A] covenant restraining trade or competition inserted in a contract for personal services is not in itself invalid if the interest to be protected is consonant with public policy and if the restraint is limited reasonably in time and space. What is reasonable depends upon the facts.” Becker at 358.
In the case at bar, the defendant has failed to provide the court with any evidence of damages it incurred as a result of any breach of the Post-Employment Activities Agreement. Furthermore, any injunction sought by the defendant would be moot because the time period restricting Ticknor’s post employment activities has expired. Accordingly, this claim cannot survive.
D.Count IV — Defamation
Count IV alleges that “Compusoft has intentionally made disparaging comments against Micro Ink which has affected its good will and business relations with its customers.” The court finds that the record does not contain any evidence to support such a finding. Therefore, this claim must fail.
E.Count V — Conversion
The record reflects that the parties voluntarily dismissed this count prior to trial.
JUDGMENT
It is therefore ORDERED that Judgment shall enter as follows:
1. On behalf of plaintiff Thomas E. Ticknor, $26,000.00 (representing the amount the defendant owes on the loan) together with interests and costs.
2. On behalf of plaintiff Compusoft Services, Inc., $14,842.93 (representing work done by Ticknor pursuant to the Purchase of Programming and Consulting Services agreement) together with interests and costs.
3. Judgment shall enter for plaintiffs/defendants, Thomas E. Ticknor and Compusoft Services, Inc. in counterclaim on the counterclaim of Micro Ink Systems Corp.