VALERIE CIARDI[1] *vs.* F. HOFFMANN-LA ROCHE, LTD., & others.[2]

Middlesex. October 4, 2001. - February 8, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Consumer Protection,* Availability of remedy. *Massachusetts Anti-Trust Act.*

Indirect purchasers could assert claims in a civil action for price-fixing or other anticompetitive conduct under G. L. c. 93A, § 9, even though they had no standing to bring such claims under the Massachusetts Antitrust Act, G. L. c. 93, §§ 1-14A. [56-67] SOSMAN, J., dissenting, with whom COWIN and CORDY, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on June 29, 1999.

Motions to dismiss were heard by *Margot Botsford,* J., and the matter was reported to the Appeals Court by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Charles Fried (Michelle D. Miller* with him) for F. Hoffman-La Roche, Ltd., & others.

*Edward D. Rapacki (Fredric L. Ellis & Joseph M. Makalusky* with him) for the plaintiff.

*Joseph F. Ryan,* for Lonza A.G. & another, was present but did not argue.

*Neil P. Motenko,* for Chinook Group, Inc., & another, was present but did not argue.

The following submitted briefs for amici curiae:

---

[1]Individually and on behalf of others similarly situated. The plaintiff's claims were filed as a class action lawsuit pursuant to Mass. R. Civ. P. 23, 365 Mass. 767 (1974). She purports to represent all Massachusetts consumers who purchased vitamin products supplied by any of the defendants from January 1, 1990, to the present.

[2]Hoffmann-La Roche, Inc.; Roche Vitamins Inc.; BASF A.G.; BASF Corporation; Rhone-Poulenc, S.A.; Rhone-Poulenc Animal Nutrition, Inc.; Rhone-Poulenc, Inc.; Lonza A.G.; Lonza Inc.; Chinook Group, Ltd.; Chinook Group, Inc.; DCV, Inc.; and Ducoa L.P.

*Paul E. Nemser, James C. Rehnquist, & Jaren D. Wilcoxson* for Microsoft Corporation.

*Loretta M. Smith* for New England Legal Foundation.

*Thomas F. Reilly*, Attorney General, & *Judith Whiting*, Assistant Attorney General, for the Commonwealth.

*Stuart T. Rossman* for National Consumer Law Center.

SPINA, J. The plaintiff, an indirect purchaser[3] of vitamin products manufactured and distributed by the defendants,[4] brought this action for injunctive relief and damages arising from a price-fixing conspiracy among the defendants.[5] Her complaint alleged coercive civil conspiracy (count I) and unfair or deceptive acts or practices in violation of G. L. c. 93A (count II). Each defendant filed a motion to dismiss the plaintiff's complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). A Superior Court judge granted the defendants' motions to dismiss count I of the complaint but denied their motions to dismiss count II of the complaint.[6] The judge then reported the correctness of her order denying the defendants' motions to dismiss count II of the plaintiff's complaint to the

---

[3]Indirect purchasers are persons who buy products not directly from their original source but from other parties further down the distribution chain. See *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 726 (1977).

[4]These vitamin products include (1) specific vitamins (vitamins A, B, B2, B3, B4, B5, C, E, and beta carotene); (2) vitamin premixes (a blend of several vitamins and other products in either dry or spray-on applications); and (3) products containing vitamins and vitamin premixes (vitamin supplements, milk, bread, cereal, juice, beverage powders, eggs, meat, fish, poultry, pork products, pasta, flour, rice, baby food, baby formula, pet food, and cosmetics).

[5]This case is one small part of nationwide litigation against the defendants for price-fixing and other anticompetitive conduct. A class action lawsuit was filed on September 30, 1998, in the Superior Court of the District of Columbia and then in twenty-two other jurisdictions (not including Massachusetts), asserting claims on behalf of businesses and consumers who had indirectly purchased vitamin products manufactured by one or more of the defendants. Several of the defendants pleaded guilty to Federal antitrust charges, and they entered into a master settlement agreement to resolve all class and parens patriae litigation.

[6]Several defendants sought to dismiss the plaintiff's complaint for lack of adequate notice pursuant to Mass. R. Civ. P. 8 (a) (1), 365 Mass. 749 (1974), and for failure to allege fraudulent concealment with sufficient particularity pursuant to Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974). The judge denied those motions, and the defendants have taken no further action on those claims. Several defendants also sought to dismiss the plaintiff's complaint for lack of personal jurisdiction pursuant to Mass. R. Civ. P. 12 (b) (2), 365 Mass.

Appeals Court pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), and stayed all proceedings below. We granted the parties' applications for direct appellate review. The only issue before us is whether indirect purchasers can assert claims for price-fixing or other anticompetitive conduct under G. L. c. 93A, § 9, where they have no standing to bring such claims under the Massachusetts Antitrust Act (Antitrust Act), G. L. c. 93, §§ 1-14A. Because we conclude that indirect purchasers can assert such claims, we affirm the order of the Superior Court judge.[7]

The sufficiency of the claims raised in the plaintiff's complaint is examined by accepting the allegations, and such reasonable inferences as may be drawn therefrom, as true. See *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991). A complaint is sufficient "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957).

The defendants, who dominate international markets for vitamin products,[8] are foreign corporations doing business in the Commonwealth of Massachusetts. The plaintiff alleges that, beginning in January, 1990, the defendants conspired among themselves to restrain free trade of vitamin products by suppressing and eliminating competition. The conspiracy consisted of formal and informal collusion by the defendants to (1) fix, increase, and maintain prices for vitamin products; (2) coordinate price increases among themselves for the sale of vitamin products; (3) allocate among themselves the volume of sales and market shares of vitamin products; (4) allocate among

---

754 (1974). These motions were not addressed by the judge pursuant to agreement by the parties.

[7]We acknowledge the amicus briefs filed by Microsoft Corporation; the National Consumer Law Center; the New England Legal Foundation; and the Attorney General on behalf of the Commonwealth.

[8]The defendants F. Hoffmann-La Roche, Ltd.; Hoffmann-La Roche, Inc.; and Roche Vitamins Inc., control approximately 40% of the relevant world vitamin market. The defendants BASF A.G. and BASF Corporation control approximately 20% of that market. The defendants Rhone-Poulenc, S.A.; Rhone-Poulenc Animal Nutrition, Inc.; and Rhone-Poulenc, Inc., control approximately 15% of the market.

themselves all or part of certain contracts to supply vitamin products to various customers; and (5) refrain from submitting bids, or submit collusive, noncompetitive, and rigged bids. The effect of the defendants' alleged conduct was to restrict competition in the sale of vitamin products in Massachusetts and to force consumers to pay prices for such products that were artificially inflated.

In considering the claims set forth in the plaintiff's complaint, alleging violations of G. L. c. 93A, the judge examined the relationship between that statutory scheme and the Antitrust Act. She concluded that, based on their respective language and history, G. L. c. 93A should not be interpreted to bar the plaintiff, as an indirect purchaser, from bringing an action for price-fixing or other forms of unfair competition against the defendants. Because the plaintiff had stated a claim on which relief could be granted, the defendants' motions to dismiss count II of her complaint were denied.

The defendants contend that the plaintiff's allegations of price-fixing fall within the limits of the Antitrust Act and that, in light of the precedent established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the plaintiff is precluded from bringing a claim under that Act because she is an *indirect* purchaser of vitamin products. The defendants argue that principles of statutory construction, as well as public policy concerns, mandate that G. L. c. 93A be construed harmoniously with related statutes, including the Antitrust Act. As such, indirect purchasers should be barred from bringing price-fixing claims under G. L. c. 93A. To conclude otherwise would be to allow indirect purchasers to circumvent the limitations on plaintiffs' remedies in the Antitrust Act by bringing their causes of action under G. L. c. 93A.

The purpose of the Antitrust Act, enacted in 1978, is "to encourage free and open competition in the interests of the general welfare and economy by prohibiting unreasonable restraints of trade and monopolistic practices in the commonwealth." G. L. c. 93, § 1. To that end, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful." G. L. c. 93, § 4. "Any person

who shall be injured in his business or property by reason of a violation of the provisions of [G. L. c. 93] may sue therefor and recover the actual damages sustained, together with the costs of suit, including reasonable attorney fees." G. L. c. 93, § 12. The Antitrust Act is to be "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable."[9] G. L. c. 93, § 1.

"Federal courts consistently have held that an agreement among competitors to raise, depress, stabilize, or fix the price of goods in commerce is illegal per se." *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 92 (1984). See *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). In analyzing § 4 of the Clayton Act, 15 U.S.C. § 15 (2000), the Supreme Court concluded that only the overcharged direct purchaser, and not others in the chain of manufacture or distribution (such as an indirect purchaser), was "injured in his business or property" for purposes of recovering damages for the violation of federal antitrust laws.[10] See *Illinois Brick Co.* v. *Illinois, supra* at 729-736. See also *Kansas* v. *Utilicorp United Inc.*, 497 U.S. 199, 206-208 (1990). Because the Antitrust Act is to be construed in

---

[9]Federal antitrust law includes (1) the Sherman Act, 15 U.S.C. § 1 (2000) (making illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations"); and (2) the Clayton Act, 15 U.S.C. § 15 (2000) (authorizing civil actions by any person "injured in his business or property by reason of anything forbidden in the antitrust laws").

[10]In reaching this conclusion, the Supreme Court specifically declined to modify its prior decision in *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968). See *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 736-747 (1977). In that case, the Supreme Court held that the victim of an overcharge was damaged within the meaning of § 4 of the Clayton Act, 15 U.S.C. § 15, and that the defendant could not introduce evidence that the purchaser had "passed on" the overcharge to its own customers, thereby sustaining no injury. *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp., supra* at 488-494. In considering whether to allow the indirect purchasers to maintain a cause of action against the anticompetitive actors, the Supreme Court would have had to modify its holding in *Hanover Shoe* because to do otherwise would have permitted multiple recoveries of the same damages, once by the direct purchasers and again by the indirect purchasers. *Illinois Brick Co.* v. *Illinois, supra* at 728-735. The Supreme Court rejected a proposed modification of *Hanover Shoe* based on considerations of stare decisis and for reasons of public policy. *Id.* at 736-746.

harmony with judicial interpretations of comparable Federal antitrust statutes, the rule of law established in *Illinois Brick Co.* v. *Illinois, supra,* would apply with equal force to preclude claims brought under G. L. c. 93 by indirect purchasers in Massachusetts. See *Boos* v. *Abbott Labs.,* 925 F. Supp. 49, 51 (D. Mass. 1996). See also *Commonwealth* v. *Mass. CRINC, supra* at 89 n.9, 95 n.14 (recognizing economic harm suffered by indirect purchasers as result of defendants' price-fixing would not be capable of remediation in light of Supreme Court's *Illinois Brick* decision, but declining to consider whether defendants' activities would constitute a violation of G. L. c. 93A).

The plaintiff does not dispute that she is an indirect purchaser of the defendants' vitamin products within the meaning of *Illinois Brick Co.* v. *Illinois, supra,* and that she is therefore foreclosed from pursuing her cause of action under the Antitrust Act. Undoubtedly for that reason, the plaintiff has asserted her claim for relief under G. L. c. 93A. Federal antitrust laws do not expressly preempt States from enacting statutes allowing indirect purchasers to recover damages for their injuries. See *California* v. *ARC Am. Corp.,* 490 U.S. 93, 101-102, 105 (1989) (rejecting claim that California's antitrust law, which specifically allowed indirect purchaser actions, was inconsistent with, and thus preempted by, Federal law). That is exactly what happened in Massachusetts with the enactment of G. L. c. 93A, "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Linthicum* v. *Archambault,* 379 Mass. 381, 383 (1979), quoting *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 693 (1975).

General Laws c. 93A regulates trade and commerce "directly or *indirectly* affecting the people of this commonwealth" (emphasis added).[11] G. L. c. 93A, § 1. The broad language of G. L. c. 93A, § 9 (1), provides that a cause of action may be brought by "[*a*]*ny* person, [other than a businessperson entitled to bring an action under § 11], who has been injured by another

---

[11]In contrast, the Antitrust Act only regulates trade or commerce that "*directly* and substantially affects the people of the commonwealth" (emphasis added). See G. L. c. 93, §§ 2, 4.

person's use or employment of any method, act or practice declared to be unlawful by section two" (emphasis added). General Laws c. 93A, § 2, states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

In analyzing what constitutes unfair methods of competition and unfair or deceptive acts or practices, which are not defined in G. L. c. 93A, this court looks to interpretations by the Federal Trade Commission and Federal courts of § 5(a)(1) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a)(1) (2000).[12] See G. L. c. 93A, § 2 (*b*). See also *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595-596 (1975). The Federal Trade Commission may, under § 5(a)(1) of the FTC Act, enforce the antitrust laws, including the Sherman Act and the Clayton Act, but it is not confined to their specific prohibitions. See *Federal Trade Comm'n* v. *Motion Picture Advertising Serv. Co.*, 344 U.S. 392, 394-395 (1953); *Federal Trade Comm'n* v. *Cement Inst.*, 333 U.S. 683, 692-695 (1948). It may bar incipient violations of those statutes, see *Federal Trade Comm'n* v. *Brown Shoe Co.*, 384 U.S. 316, 321-322 (1966), and conduct that, although not a violation of the letter or spirit of the antitrust laws, is nevertheless either an unfair method of competition, or an unfair or deceptive act or practice, see *Federal Trade Comm'n* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 239-244 (1972). See also *E.I. Du Pont De Nemours & Co.* v. *Federal Trade Comm'n*, 729 F.2d 128, 136-137 (2d Cir. 1984). To the extent that the same conduct may violate both the antitrust laws and the FTC Act, such conduct may be the subject of simultaneous parallel enforcement actions. See *Federal Trade Comm'n* v. *Cement Inst.*, *supra* at 694-695.

Price-fixing constitutes an unfair method of competition in violation of the FTC Act. See *Federal Trade Comm'n* v. *National Lead Co.*, 352 U.S. 419, 428-430 (1957). See also *Sun Oil Co.* v. *Federal Trade Comm'n*, 350 F.2d 624, 631, 636 (7th Cir.

---

[12]Section 5(a)(1) of the Federal Trade Commission Act states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1) (2000).

1965), cert. denied, 382 U.S. 982 (1966); *Keasbey & Mattison Co.* v. *Federal Trade Comm'n,* 159 F.2d 940, 946 (6th Cir. 1947); *Boos* v. *Abbott Labs., supra* at 54.[13] Therefore, the allegations in the plaintiff's complaint, which in essence state that the defendants engaged in price-fixing of vitamin products at artificially inflated levels to her detriment would, if proven, clearly state a violation of G. L. c. 93A.

The plain and unambiguous language of G. L. c. 93A reveals no legislative intent to limit lawsuits for price-fixing to direct purchasers. To the contrary, because the language of G. L. c. 93A, §§ 1, 9 (1), allows *any* person who has been injured by trade or commerce *indirectly* affecting the people of this Commonwealth to bring a cause of action, the plaintiff is the type of consumer the Legislature intended to protect.[14] Significantly, there is no requirement of contractual privity between the plaintiff and the defendants under G. L. c. 93A, § 9. See *Kattar* v. *Demoulas,* 433 Mass. 1, 14-15 (2000) ("Parties need not be in privity for their actions to come within the reach of c. 93A"); *Maillet* v. *ATF-Davidson Co.,* 407 Mass. 185, 191-192 (1990) (injured printing press operator could maintain suit against manufacturer); *Burnham* v. *Mark IV Homes, Inc.,* 387 Mass. 575, 581 (1982) (buyer of modular home could sue manufacturer).

It is a canon of statutory construction that "the primary source of insight into the intent of the Legislature is the language of the statute." *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 853 (1983). Where, as here, the language of a statute is clear and unambiguous, it is conclusive as to the intent of the

---

[13]Several of these cases also include language stating that price-fixing constitutes an unfair practice in violation of the FTC Act. This is a distinction without a difference in the present case because G. L. c. 93A, § 2, prohibits *both* "[u]nfair methods of competition" and "unfair or deceptive acts or practices."

[14]The broad scope of G. L. c. 93A is evidenced by the fact that it encompasses claims where a plaintiff's damages are de minimis. See *Leardi* v. *Brown,* 394 Mass. 151, 157-163 (1985) (tenants could bring action under G. L. c. 93A for inclusion of illegal term in lease, even where tenants suffered no actual harm, because mere invasion of legal right to habitable premises constituted injury). See also *Clegg* v. *Butler,* 424 Mass. 413, 418 (1997) (third-party claimants could bring actions against liability insurers who violated G. L. c. 93A by invading their legally protected interests).

Legislature. See *Pyle* v. *School Comm. of S. Hadley*, 423 Mass. 283, 285 (1996). "Where the ordinary meaning of the statutory terms yields a workable result, we need not resort to extrinsic aids of interpretation such as legislative history."[15] *Id.* at 286.

The defendants assert that the Antitrust Act specifically governs contracts, combinations, or conspiracies in restraint of trade or commerce, see G. L. c. 93, § 4, which is the type of conduct that the plaintiff has alleged.[16] They further assert that, in contrast, G. L. c. 93A, § 9, is a general remedy for consumers injured by any unfair method of competition and unfair or deceptive act or practice in the conduct of any trade or commerce. The defendants argue that, because the provisions of

[15]Following the Supreme Court's decision in *Illinois Brick Co.* v. *Illinois*, *supra*, some States enacted so-called *Illinois Brick* repealer statutes to permit damages actions by or on behalf of indirect purchasers. See, e.g., Cal. Bus. & Prof. Code ·§ 16750(a) (Deering 1992); Me. Rev. Stat. Ann. tit. 10, § 1104 (West 1997); N.Y. Gen. Bus. Law § 340(6) (McKinney Supp. 2002); R.I. Gen. Laws § 6-36-12(g) (2001); Vt. Stat. Ann. tit. 9, § 2465(b) (Supp. 2001). For a discussion on State responses to *Illinois Brick Co.* v. *Illinois*, *supra*, see K. O'Connor, Is the *Illinois Brick* Wall Crumbling?, 15 Antitrust 34, 35 (Summer 2001) (noting that thirty-six States and District of Columbia, representing over seventy per cent of the nation's population, now provide for some sort of right of action on behalf of some or all indirect purchasers). The defendants contend that the fact that the Legislature declined to enact such legislation in Massachusetts, as proposed on several occasions by the Attorney General, suggests an intent not to recognize causes of action by indirect purchasers. See 1985 Senate Doc. No. 1071; 1986 Senate Doc. No. 1033; 1987 House Doc. No. 4104; 1990 Senate Doc. No. 101; 1991 Senate Doc. No. 1579; 1992 Senate Doc. No. 1563; 1993 Senate Doc. No. 120; 1994 Senate Doc. No. 82. However, no inference is possible from this negative history. "The fallacy in th[e] argument is that no one knows why the legislature did not pass the proposed measure[]. . . . The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Franklin* v. *Albert*, 381 Mass. 611, 615-616 (1980), quoting *Berry* v. *Branner*, 245 Or. 307, 311 (1966). One such reason is the "[b]elief that the matter should be left to be handled by the normal processes of judicial development of decisional law, including the overruling of outstanding decisions to the extent that the sound growth of the law requires." *Franklin* v. *Albert*, *supra* at 616, quoting H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1395-1396 (tent. ed. 1958). Moreover, the proposed bills, if enacted, would have modified the Antitrust Act, not G. L. c. 93A.

[16]While the plaintiff has alleged in her complaint that the defendants entered into a conspiracy in illegal restraint or monopoly of trade, she also alleged that the defendants' price-fixing conspiracy constituted "unfair and/or deceptive acts or practices within the meaning of G. L. c. 93A, § 2."

the specific statute must control, G. L. c. 93A must be construed consistently with the Antitrust Act to bar claims by indirect purchasers.

, Federal antitrust statutes (such as the Clayton Act) and Federal consumer statutes (such as the FTC Act) were enacted to deal with closely related aspects of the same problem, namely the protection of free and fair competition. See *United States* v. *American Bldg. Maintenance Indus.*, 422 U.S. 271, 277 (1975). Because the Antitrust Act and G. L. c. 93A are patterned after their Federal counterparts, we believe that they, too, in part, are related to the same purpose — the protection of free and fair competition.

Statutes addressing the same subject matter clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law. See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996); *Marco* v. *Green*, 415 Mass. 732, 736 (1993). However, the language of the Antitrust Act unambiguously states that it "shall have no effect upon the provisions of [c. 93A], except as *explicitly provided* in said [c. 93A]" (emphasis added).[17] G. L. c. 93, § 14A. General Laws c. 93A, § 11, includes a specific provision that in

---

[17]The premise of the dissent is that the court's interpretation of G. L. c. 93A, § 9, in relation to G. L. c. 93, results in contradictions and unreasonable consequences. There are no such contradictions or unreasonable consequences. The absence of any legislative enactment limiting the application of G. L. c. 93A, § 9, in claims involving antitrust allegations clearly signifies, under the mandate of G. L. c. 93, § 14A, that G. L. c. 93 has no effect on G. L. c. 93A, § 9. The dissent states that, "[w]hile inserting the word 'method' in § 9 (1), the Legislature conspicuously failed to add it to the class action provisions of § 9 (2). . . . If the Legislature intended to allow indirect purchaser consumers to bring claims for antitrust violations, it is anomalous in the extreme that the Legislature would exclude such claims from the class action mechanism of § 9 (2)." *Post* at 73. There are two responses. First, antitrust violations are actionable under G. L. c. 93A, § 9 (1), not only because they are unfair methods of competition, but also because they constitute unfair acts or practices, *supra* at note 13, and because the Legislature did not explicitly preclude antitrust activity as a violation of § 9 (1). Second, assuming that the omission of the word "method" from G. L. c. 93A, § 9 (2), precludes a class action thereunder, as the dissent suggests (the question is not before us: no class has yet been certified), it does not follow that an inability to bring a class action under § 9 (2) precludes an individual claim under § 9 (1). Nevertheless, a class action may be brought under G. L. c. 93A, § 9 (2), for unfair acts or practices, including antitrust violations. Additionally, § 9 (2), enacted in 1969, before the adoption of the Massachusetts Rules of Civil Procedure, does not preclude a class action for

any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act. General Laws c. 93A, § 9, contains no such explicit provision. If the Legislature had intended actions brought under G. L. c. 93A, § 9, to be limited in this respect, it would have said so. See *Commonwealth* v. *Galvin*, 388 Mass. 326, 330 (1983) ("where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present"). Therefore, we cannot conclude that the application of G. L. c. 93A, § 9, is to be guided by the provisions of the Antitrust Act, and by association, *Illinois Brick Co.* v. *Illinois, supra,* so as to preclude indirect purchasers, like the plaintiff, from bringing a cause of action under G. L. c. 93A, § 9.

The defendants' reliance on *Reiter Oldsmobile, Inc.* v. *General Motors Corp.,* 378 Mass. 707 (1979), and *Cabot Corp.* v. *Baddour,* 394 Mass. 720 (1985), does not support a different result. In *Reiter Oldsmobile, Inc.* v. *General Motors Corp., supra,* this court held that only the remedies afforded by G. L. c. 93B, a detailed statute enacted after G. L. c. 93A specifically to govern the unfairness in the Massachusetts automotive industry, were applicable to the plaintiff's claims that the grant of a competitive motor vehicle franchise without the current franchisee's prior approval constituted an unfair method of competition and unfair or deceptive act or practice within the meaning of G. L. c. 93A, § 2. We pointed out that there was a careful limitation on the private remedies set forth in G. L. c. 93B, § 12, which excluded injunctive relief, a remedy available under G. L. c. 93A, § 9. See *id.* at 711. As such, while G. L. c. 93A and G. L. c. 93B might overlap in their coverage, in the case of a conflict, such as the remedies available to a plaintiff, the language of the specific statute, namely G. L. c. 93B, must govern. See *id.* Similarly, in *Cabot Corp.* v. *Baddour, supra,* this court held that G. L. c. 110A (Uniform Securities Act), a comprehensive regulatory scheme governing the registration

unfair methods of competition pursuant to the more burdensome provisions of Mass. R. Civ. P. 23. See *Fletcher* v. *Cape Cod Gas Co.,* 394 Mass. 595 (1985); *Baldassari* v. *Public Fin. Trust,* 369 Mass. 33, 40-41 (1975).

and sale of securities in Massachusetts in coordination with Federal securities laws, was applicable to the plaintiff's claims of fraudulent securities transactions, rather than G. L. c. 93A. We pointed out that G. L. c. 110A differed from G. L. c. 93A in several critical respects, including its limitation on private rights of action and the nature and scope of available relief; more expansive rights of action and remedies were available under G. L. c. 93A. See *id.* at 725.

Unlike the particular statutes in *Reiter Oldsmobile, Inc.* v. *General Motors Corp., supra,* and *Cabot Corp.* v. *Baddour, supra,* neither the Antitrust Act nor G. L. c. 93A is a comprehensive statutory scheme enacted to govern all antitrust claims to the exclusion of the other. To the contrary, the Legislature intended that the Antitrust Act would not infringe on the scope of G. L. c. 93A, *except* as G. L. c. 93A might itself explicitly provide, see G. L. c. 93, § 14A, which negates the possibility for conflict among their provisions and in their application. Cf. *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 773-774 n.15 (1980) (noting Antitrust Act operates independently of G. L. c. 93A except to extent G. L. c. 93A, § 11, directs courts to consider decisions under Antitrust Act when interpreting "unfair methods of competition" in actions brought pursuant to G. L. c. 93A, § 11); *Dodd* v. *Commercial Union Ins. Co.,* 373 Mass. 72, 76-78 (1977) ("Chapter 176D on its face does not exclude application of c. 93A to unfair and deceptive insurance practices . . . [t]he mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter"). Moreover, G. L. c. 93A and the Antitrust Act are not in conflict or inconsistent with each other merely because the former would allow indirect purchasers to sue for damages while the latter would not.[18]

The defendants assert that, notwithstanding the Antitrust Act,

---

[18]In light of our conclusion that G. L. c. 93A allows indirect purchasers to bring a cause of action for anticompetitive conduct that would be precluded under the Antitrust Act, the defendants' argument that the plaintiff could not be "injured" within the meaning of G. L. c. 93A, § 9, because she is not "injured" under the Antitrust Act is without merit. The court in *Illinois Brick Co.* v. *Illinois, supra* at 746-747, did not conclude that indirect purchasers were not injured by illegal overcharges passed on by direct purchasers. Rather,

the plaintiff has failed to allege a sufficiently close nexus between herself and the defendants to state a claim under G. L. c. 93A. The defendants point out that they are many levels removed in the chain of distribution from the plaintiff, a consumer of a wide range of products, many of which contain vitamin products as only a minor component. The defendants contend that the plaintiff would be hard pressed to show how a portion of an overcharge was passed on at *each* stage of the distribution chain and by which defendants.

The defendants' contentions essentially relate to whether the plaintiff can prove her claim under G. L. c. 93A, not whether she is entitled, as an indirect purchaser, to assert such a claim. In her complaint, the plaintiff alleged that she had purchased vitamin products manufactured, produced, distributed, and sold by the defendants and that, as the result of a price-fixing conspiracy among the defendants, she was forced to pay "supra-competitive prices" for those products. The plaintiff has a relatively light burden to carry to maintain her complaint, and doubt as to whether a particular claim can be proved is not a proper basis for dismissing a complaint under rule 12 (b) (6). See *Gibbs Ford, Inc.* v. *United Truck Leasing Corp.*, 399 Mass. 8, 13 (1987); *Wrightson* v. *Spaulding*, 20 Mass. App. Ct. 70, 72 (1985). In light of our conclusion that indirect purchasers can bring a cause of action under G. L. c. 93A, and accepting all of the allegations in the plaintiff's complaint as true, she has stated a claim on which relief can be granted. Whether the plaintiff can prove her claim is another matter entirely. Nonetheless, contrary to the defendants' assertions, the plaintiff has alleged a connection between herself and the defendants, albeit an indirect one, as parties to consumer transactions. Contrast *John Boyd Co.* v. *Boston Gas Co.*, 775 F. Supp. 435, 440 (D. Mass. 1991) (plaintiffs failed to state cause of action under G. L. c. 93A, § 11, where there was no business connection between parties); *Cash Energy, Inc.* v. *Weiner*, 768 F. Supp. 892, 893-894 (D.

---

it concluded that indirect purchasers should not be permitted to pursue damages claims for such injuries because of the burdens that such lawsuits would place on the judicial system and because limiting recovery to direct purchasers was a more efficient means of making antitrust violators pay for their illegal acts given the small stakes of indirect purchasers in these lawsuits. *Id.* at 736-747.

Mass. 1991) (same). See also *Nei* v. *Boston Survey Consultants, Inc.*, 388 Mass. 320, 324-325 (1983) (recognizing that while there was no requirement of contractual privity under G. L. c. 93A, plaintiffs had failed to state cause of action where they had no business relationship with defendants). The defendants are manufacturing and distributing vitamin products that are intended for use by persons exactly like the plaintiff, the ultimate consumer.

Finally, the defendants assert that strong public policy considerations dictate that indirect purchaser claims be barred under G. L. c. 93A.[19] In precluding indirect purchaser claims under § 4 of the Clayton Act, 15 U.S.C. § 15, the Supreme Court's analysis in *Illinois Brick Co.* v. *Illinois, supra*, focused, in part, on the negative impact that such claims would have on Federal antitrust litigation, including the possibility of multiple liability for defendants, the difficulty faced by an indirect purchaser in proving damages, and the potential burden on the judicial system of long and complicated proceedings. However, in *California* v. *ARC Am. Corp.*, 490 U.S. at 103-105, the Supreme Court recognized that it was inappropriate to consider the congressional policies identified in *Illinois Brick Co.* v. *Illinois, supra*, as defining what States should allow under their own antitrust laws. "[N]othing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *California* v. *ARC Am. Corp., supra* at 103. To that end, it is the province of the Massachusetts Legislature to make its own policy decisions about whether to permit claims by indirect purchasers for antitrust violations under Massachusetts law.[20] We read the language of G. L. c. 93A as a clear statement of

---

[19]The dissent suggests that it "makes no sense . . . to [permit both direct and indirect purchasers to bring suit] in the same State court system." *Post* at 77. We are not persuaded that permitting only direct purchasers to bring a cause of action and retain as damages the amount that they passed along to indirect purchasers, something that the dissent recognizes as a windfall at the expense of the true victims further down the distribution chain, is the correct result. *Post* at 76-77.

[20]Some of the perceived difficulty in calculating and apportioning damages between direct and indirect purchasers was obviated by the Massachusetts Legislature when it included language in G. L. c. 93A, § 9 (3), allowing consumers who prevailed on claims of unfair methods of competition and

legislative policy to protect Massachusetts consumers through the authorization of such indirect purchaser actions.[21] Any disagreement with the statute should be directed to the Legislature.

*Order denying the defendants'
motions to dismiss count II
of the complaint affirmed.*

SOSMAN, J. (dissenting, with whom Cowin and Cordy, JJ., join). I agree with the court that, read literally and by itself, G. L. c. 93A, § 9 (1), would allow an indirect purchaser consumer to bring an action premised on a defendant's violation of the antitrust laws. Since its amendment in 1979 (St. 1979, c. 406, § 1), G. L. c. 93A, § 9 (1), allows consumers to bring individual claims for any "method" declared unlawful by G. L. c. 93A, § 2. Where § 2 prohibits "unfair methods of competition," and where antitrust violations have long been recognized as "unfair methods of competition," the insertion of the word "method" in § 9 (1) made antitrust violations actionable under § 9 (1). Nothing in § 9 itself precludes an indirect purchaser from showing that he or she has been "injured" by such violations. Although such indirect purchaser actions are not allowed under the Massachusetts Antitrust Act, G. L. c. 93, I also agree with the court that the express provisions of G. L. c. 93, § 14A, preclude resort to the principles of *Cabot Corp.* v. *Baddour*, 394 Mass. 720, 724-726 (1985), and *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 711 (1979), to resolve the apparent contradiction

---

unfair or deceptive acts or practices in the conduct of any trade or commerce to recover actual damages or twenty-five dollars, whichever was greater. To the extent that the plaintiff is able to prevail on the issue of liability but is unable to prove actual damages, the Legislature has decided that she is entitled to a specified remedy. See *Whyte* v. *Connecticut Mut. Life Ins. Co.*, 818 F.2d 1005, 1012 (1st Cir. 1987); *Leardi* v. *Brown*, 394 Mass. 151, 160 (1985).

[21]The Attorney General has both a common-law duty and a specific statutory mandate to protect the public interest and enforce public rights. See *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 88 (1984). See also G. L. c. 93A, §§ 2, 4, 5, 6, 7, 8. Nothing in this opinion should be construed as limiting the Attorney General's powers and remedies under G. L. c. 93A to seek redress for indirect purchasers for unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

between G. L. c. 93 and G. L. c. 93A, § 9 (1), on the issue of indirect purchaser antitrust claims.

However, the precise problem before us today — namely, the applicability of *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) (*Illinois Brick*), to claims under § 9 (1) — was neither addressed nor contemplated by the Legislature in the 1979 amendments inserting the word "method" into § 9 (1), an insertion that was plainly motivated by concerns utterly unrelated to *Illinois Brick*. Meanwhile, in both G. L. c. 93A, § 11, and in G. L. c. 93, § 1, the Legislature has made clear that it does intend to adhere to the principles of *Illinois Brick*. Interpreting § 9 (1) as a repudiation of *Illinois Brick* appears contrary to the Legislature's intent, notwithstanding the technical accuracy of the court's literal reading of § 9 (1). There are occasions when a literal construction of a statute yields "absurd or unreasonable" results, such that that literal construction should not be adopted. *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). This is one of those rare occasions. Where the Legislature has made express its decision to follow *Illinois Brick* in all other contexts, it is both "absurd" and "unreasonable" to interpret § 9 (1) in a manner that will undermine *Illinois Brick* for one type of claimant. In light of the history of G. L. c. 93A and G. L. c. 93, and in light of the drastic but unintended consequences of departing from *Illinois Brick* for only a single category of claimants, I am convinced that we should interpret G. L. c. 93A, § 9 (1), in a manner that comports with *Illinois Brick*.

From its inception, G. L. c. 93A, § 2 (*a*), has declared unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . . " Those terms are to be interpreted consistently with the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2000), as interpreted by the Federal Trade Commission. G. L. c. 93A, § 2 (*b*). The term "unfair method of competition" has, from the earliest days of the Federal Trade Commission Act, included all forms of antitrust violations.

When originally enacted in 1914, the Federal Trade Commis-

sion Act declared unlawful only "unfair methods of competition in commerce." Federal Trade Commission Act, c. 311, § 5, 38 Stat. 717 (1917). Antitrust violations, including price-fixing, came within that original prohibition. See, e.g., *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U.S. 441, 455 (1922) (vertical price-fixing); *Cream of Wheat Co.* v. *Federal Trade Comm'n*, 14 F.2d 40, 48 (8th Cir. 1926) (same). Following the 1938 amendment to the Act (Wheeler-Lea Act, c. 49, § 3, 52 Stat. 111 [1938]), which added the prohibition against "unfair or deceptive acts or practices in commerce," antitrust violations still continued to be labeled as "unfair methods of competition," not as "unfair or deceptive acts or practices." See, e.g., *Federal Trade Comm'n* v. *Ticor Title Ins. Co.*, 504 U.S. 621, 625 (1992) (horizontal price-fixing arrangement charged as "unfair method of competition"); *Federal Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 418-419, 422 (1990) (boycott to force higher fees charged as "[u]nfair method of competition"); *Federal Trade Comm'n* v. *National Lead Co.*, 352 U.S. 419, 428 (1957) (in case challenging uniform pricing system, "[t]he relevant sections [of the FTC Act] empower the Commission to prevent the use of unfair methods of competition"); *Federal Trade Comm'n* v. *Cement Inst.*, 333 U.S. 683, 720 (1948) (point-based price system was "an unfair method of competition prohibited by the Federal Trade Commission Act"); *Lenox, Inc.* v. *Federal Trade Comm'n*, 417 F.2d 126 (2d Cir. 1969) (price maintenance agreement charged as "unfair method of competition"); *Advertising Specialty Nat'l Ass'n* v. *Federal Trade Comm'n*, 238 F.2d 108, 111 (1st Cir. 1956) (illegal use of list price charged as "adoption and use of unfair methods of competition"); *Chain Inst., Inc.* v. *Federal Trade Comm'n*, 246 F.2d 231, 235 (8th Cir.), cert. denied, 355 U.S. 895 (1957) ("conduct which tends to restrain trade by fixing prices is an unfair method of competition"); *Allied Paper Mills* v. *Federal Trade Comm'n*, 168 F.2d 600, 605 (7th Cir. 1948), cert. denied, 336 U.S. 918 (1949) ("price fixing combination or agreement is clearly an unfair method of competition within the [FTC] Act"); *Keasbey & Mattison Co.* v. *Federal Trade Comm'n*, 159 F.2d 940, 942, 946 (6th Cir. 1947) (price-fixing arrangements, "if proven, constitute

an 'unfair method of competition' " within meaning of FTC
Act); *Fort Howard Paper Co.* v. *Federal Trade Comm'n*, 156
F.2d 899, 900, 906 (7th Cir.), cert. denied, 329 U.S. 795 (1946)
(uniform pricing system led to FTC complaint that companies
"engaged in unfair methods of competition"); *Eugene Dietzgen
Co.* v. *Federal Trade Comm'n*, 142 F.2d 321, 326 (7th Cir.),
cert. denied, 323 U.S. 730 (1944) ("price fixing agreement is an
'unfair method of competition' "); *Phelps Dodge Ref. Corp.* v.
*Federal Trade Comm'n*, 139 F.2d 393, 395-396 (2d Cir. 1943)
(exchange of price information resulted in FTC complaint charg-
ing "unfair methods of competition"); *California Lumbermen's
Council* v. *Federal Trade Comm'n*, 115 F.2d 178, 180, 184 n.2
(9th Cir. 1940), cert. denied, 312 U.S. 709 (1941) (horizontal
price-fixing and boycotting charged by FTC as "violation of
fair methods of competition").

In its evolution, G. L. c. 93A has used similar terminology —
i.e., "[u]nfair methods of competition" or a "method" declared
unlawful by § 2 — to refer to antitrust violations. As originally
enacted (St. 1967, c. 813, § 1), the statute allowed the Attorney
General to bring an enforcement action against any person who
"is using or about to use any method, act or practice" declared
unlawful by § 2. G. L. c. 93A, § 4.[1] In light of the long-
standing precedent that made antitrust violations an "unfair
method of competition," the Attorney General's power to
remedy any "method" declared unlawful by § 2 clearly
included the power to remedy antitrust violations.

In 1969, the Legislature added a private right of action provi-
sion to the statute. St. 1969, c. 690. In that first version of G. L.
c. 93A, § 9, the Legislature allowed consumers to bring an ac-
tion if they had suffered a loss of money or property from a
defendant's "unfair or deceptive act or practice." *Id.* Conspicu-
ously absent was any consumer private right of action stem-
ming from the use of an "unfair method of competition." The
omission was deliberate. See Rice, New Private Remedies for

---

[1]In that original version, G. L. c. 93A conferred no private right of action
but instead lodged all enforcement and remedial powers exclusively in the At-
torney General. This approach was consistent with the Federal Trade Commis-
sion Act, 15 U.S.C. § 45(a)(1) (2000), which still lodges enforcement author-
ity only in the Federal Trade Commission and creates no private right of
action. See *Holloway* v. *Bristol-Myers Corp.*, 485 F.2d 986, 988 (D.C. Cir.
1973).

Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 312 (1969) (amendment's orientation to consumers demonstrated "by the fact that section 9 creates a cause of action for injuries resulting from the use of 'unfair or deceptive acts or practices' and not additionally for injury caused by the use of 'unfair methods of competition' which are also declared to be unlawful by section 2 of the act").[2]

Three years later, the Legislature added a private right of action for plaintiffs who were themselves in trade or commerce. St. 1972, c. 614, § 2. Unlike consumer plaintiffs under § 9, plaintiffs engaged in business were accorded a cause of action for the use of "*an unfair method of competition* or an unfair or deceptive act or practice" (emphasis added). G. L. c. 93A, § 11. And, in express recognition that the term "unfair method of competition" encompassed violations of the antitrust laws, the Legislature provided that "the court shall also be guided in its interpretation of unfair methods of competition by those provisions of [G. L. c. 93] known as the Massachusetts Antitrust Act." G. L. c. 93A, § 11, as amended by St. 1978, c. 459, § 3.

There are two important ramifications of that cross-reference. First, if the Legislature had intended that antitrust violations would also come within the term "unfair or deceptive acts or practices in the conduct of any trade or commerce," the cross-reference to the Massachusetts Antitrust Act would not have been limited to the interpretation of "unfair methods of competition."[3] Second, by means of that cross-reference, G. L. c. 93A claims brought by business plaintiffs predicated on defendants' antitrust violations must be consistent with the principles of G. L. c. 93 (including its adoption of Federal antitrust principles, G. L. c. 93, § 1). Thus, under G. L. c. 93A, § 11, as under G. L. c. 93, the principles of *Illinois Brick* preclude actions by indirect purchasers.

In 1979, the Legislature amended the G. L. c. 93A, § 9,

---

[2]The author of the article was one of the principal draftsmen of St. 1969, c. 690. Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 307 n.* (1969).

[3]By comparison, the consumer private action in G. L. c. 93A, § 9, which did not then include a remedy for "unfair methods of competition," contained no cross-reference to the Massachusetts Antitrust Act.

consumers' cause of action in several respects. See St. 1979,
c. 406, § 1. The amendment removed the requirement that the
consumer plaintiff have "purchase[d] or lease[d] goods, services
or property," St. 1979, c. 72, § 1, as well as the requirement
that the consumer plaintiff "thereby [have] suffer[ed] any loss
of money or property," id., replacing these requirements with
the broader predicate that the plaintiff merely have "been
injured" by the defendant's violation. The Legislature also
specified that plaintiffs "whose rights are affected" by viola-
tions of G. L. c. 176D, § 3 (9), could pursue such a claim under
G. L. c. 93A, § 9.

These amendments were prompted by this court's decisions
in Dodd v. Commercial Union Ins. Co., 373 Mass. 72, 81-83
(1977), and Baldassari v. Public Fin. Trust, 369 Mass. 33
(1975). In Dodd v. Commercial Union Ins. Co., supra, we held
that, while violations of G. L. c. 176D, § 2, were actionable
under G. L. c. 93A, § 9, such actions could only be brought by
plaintiffs who had themselves purchased the insurance policy in
question. Only the actual purchaser of the policy (not additional
named insureds or third parties claiming against the insured)
could satisfy the provisions of § 9 requiring that the plaintiff
have "purchase[d] or lease[d] goods, services or property," and
that the plaintiff "thereby [have] suffer[ed] any loss of money
or property." See id. In Baldassari v. Public Fin. Trust, supra at
44-45 & n.5, we held that claims by plaintiffs complaining of
unfair debt collection practices had been properly dismissed for
the plaintiffs' failure to allege that the practices, although
extreme and outrageous, had resulted in the "loss of money or
property, real or personal." By eliminating those requirements,
and by the express reference to persons whose "rights" were
"affected" by violations of G. L. c. 176D, § 9 (3), the
Legislature overruled the limitations that we had identified in
Dodd v. Commercial Union Ins. Co., supra, and Baldassari v.
Public Fin. Trust, supra. See Leardi v. Brown, 394 Mass. 151,
158 (1985); Van Dyke v. St. Paul Fire & Marine Ins. Co., 388
Mass. 671, 674-675 (1983).

As part of those 1979 amendments to § 9, the Legislature for
the first time inserted the word "method" in the list of viola-
tions that would give rise to an action under § 9 (1). Under the

current version, any plaintiff who has been "injured" by a defendant's "use or employment of any *method*, act or practice declared to be unlawful" under § 2 may bring an action under § 9. G. L. c. 93A, § 9 (1) (emphasis added). It is that insertion of the term "method" in § 9 (1), which refers to "[u]nfair methods of competition" proscribed by § 2, that now makes antitrust violations actionable by a consumer who has been "injured" by such violations.

Bearing in mind, however, that these amendments were prompted by a desire to overrule *Dodd* v. *Commercial Union Ins. Co.*, *supra*, the insertion of the word "method" appears to have been prompted by the Legislature's intent to make all violations of G. L. c. 176D actionable under G. L. c. 93A, § 9. General Laws c. 176D, § 2, proscribes any trade practice determined to be "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance," and the list of prohibited practices set forth in G. L. c. 176D, § 3, constitutes the definition of "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." It is not surprising that, in an attempt to clarify that all violations of G. L. c. 176D were within the ambit of G. L. c. 93A, § 9, terminology consistent with G. L. c. 176D was employed.

While inserting the word "method" in § 9 (1), the Legislature conspicuously failed to add it to the class action provisions of § 9 (2). Section 9 (2) allows the plaintiff to pursue a class action "if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons." Consumer class actions under § 9 (2) are thus still limited to persons who have been injured by an "unfair or deceptive act or practice" and do not extend to persons injured by "[u]nfair methods of competition."[4] If the Legislature intended to allow indirect purchaser consumers to bring claims for antitrust violations, it is anomalous in the extreme that the Legislature would exclude such claims from the class action mechanism of § 9 (2).

---

[4]By comparison, the class action provisions of G. L. c. 93A, § 11, expressly allow such actions "if the use or employment of *the unfair method of competition* or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated" (emphasis added).

By their nature, such claims will be held by vast numbers of consumer victims, with each victim ordinarily suffering only a very small monetary injury. Such claims, if the Legislature actually intended to allow them, would be a paradigm class action. That the Legislature did not include the word "method" in § 9 (2) strongly suggests that the insertion of the word "method" in § 9 (1) had nothing to do with indirect purchaser antitrust claims.

It appears that, in inserting the word "method" in § 9 (1), the Legislature was not even contemplating antitrust actions at all. Nothing in *Dodd* v. *Commercial Union Ins. Co.*, *supra*, had anything to do with antitrust violations, and there is nothing to suggest that concerns about consumer plaintiffs' inability to pursue antitrust violations under G. L. c. 93A prompted the 1979 amendments. In no event should the mere insertion of the word "method" in § 9 (1), an insertion made as part of a legislative overruling of *Dodd* v. *Commercial Union Ins. Co.*, *supra*, be interpreted as a legislative decision to depart from the long-standing principle of both Federal and Massachusetts antitrust law that expressly precluded indirect purchaser claims in accordance with *Illinois Brick*.[5] There is no reason to believe that amendments aimed at overruling *Dodd* v. *Commercial Union Ins. Co.*, *supra*, simultaneously intended a dramatic change in the Legislature's approach to antitrust remedies. Drastic consequences of this magnitude should not flow from ambiguity and oversight in draftsmanship. "It is not to be lightly supposed that radical changes in the law were intended where not plainly expressed." *Commonwealth* v. *Burke*, 390 Mass. 480, 486 (1983), quoting *Ferullo's Case*, 331 Mass. 635, 637 (1954).

Here, under the court's interpretation, we have not only a "radical change" in the law but an irreconcilable conflict with another policy that the Legislature has announced in unambiguous terms. The Massachusetts Antitrust Act was enacted in 1978, one year after the Supreme Court's decision in *Illinois*

---

[5]Until the Supreme Court's decision ten years later in *California* v. *ARC Am. Corp.*, 490 U.S. 93, 103-105 (1989), it was not even clear that the States would be permitted to deviate from *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) (*Illinois Brick*).

*Brick.* When the Legislature provided that the Massachusetts Antitrust Act "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes," G. L. c. 93, § 1, it unambiguously announced that our State antitrust law would follow the principles articulated in *Illinois Brick.* See *Commonwealth* v. *Mass. CRINC,* 392 Mass. 79, 95 n.14 (1984) (upholding preliminary injunction in antitrust action brought by Attorney General, noting that *Illinois Brick* would prevent indirect purchaser consumers from recovering damages for increased prices). And, when it expressly made antitrust claims actionable under G. L. c. 93A, § 11, it provided that the interpretation of those provisions was "to be guided" by the provisions of G. L. c. 93, and thus by the Federal precedent (including *Illinois Brick*) applicable to antitrust actions. While each statute has some distinct provisions,[6] the underlying principles of Federal antitrust law were to be applied consistently across both statutes.

There is no question that the Legislature could, if it chose, adopt a contrary policy and reject *Illinois Brick.* See *California* v. *ARC Am. Corp.,* 490 U.S. 93, 103-105 (1989). To date, however, the Legislature has adhered to its original pronouncement, notwithstanding numerous attempts to eliminate the requirements of *Illinois Brick* from the State antitrust statute.[7] While it is the Legislature's choice whether to adopt or reject

---

[6]For example, the multiple damages provisions are quite different. Compare G. L. c. 93, § 12 (court may, but is not required to, award up to treble actual damages if antitrust violation was perpetrated "with malicious intent to injure" plaintiff), with G. L. c. 93A, § 11 (court must award at least double damages if defendant's violation of § 2 was "willful or knowing"). Similarly, while G. L. c. 93A, § 11, provides a procedural mechanism whereby a defendant may tender a reasonable settlement offer in its answer and thereby avoid liability for multiple damages, no such mechanism exists for actions brought under G. L. c. 93. Antitrust claims under G. L. c. 93, § 12, must be brought in the Superior Court, while claims under G. L. c. 93A, § 11, can be brought in either the Superior Court or the District Court. Thus, G. L. c. 93, § 14A, operates to prevent any blurring of an assortment of technical, procedural, and remedial distinctions between the two statutes, while G. L. c. 93A, § 11, announces that both statutes will follow the same basic principles of antitrust law.

[7]See 1981 House Doc. No. 5416; 1985 Senate Doc. No. 1071; 1986 Senate Doc. No. 1033; 1987 House Doc. No. 4104; 1990 Senate Doc. No. 101; 1991 Senate Doc. No. 1579; 1992 Senate Doc. No. 1563; 1993 Senate Doc. No. 120; 1994 Senate Doc. No. 82.

*Illinois Brick* as a matter of State law, it would be utterly self-defeating to adhere to *Illinois Brick* under one State statute governing antitrust violations (G. L. c. 93), deviate from it in one section of another State statute dealing with antitrust violations (G. L. c. 93A, § 9 [1]), and then adhere to it again in another section of the same statute (G. L. c. 93A, § 11). The policy choice at issue pits two diametrically opposed views. The adoption of both views simultaneously would leave us with the worst of both approaches and the benefits of neither.

Under the *Illinois Brick* approach, the policy choice is to streamline antitrust litigation, avoiding the cost, delay, and uncertainty involved in uncovering and quantifying the extent to which increased prices have or have not been passed along to manufacturers, wholesalers, distributors, retailers, and consumers beyond those who have purchased directly from the violator. As the court recognizes (*ante* at note 10), *Illinois Brick* is a necessary corollary of *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (*Hanover Shoe*), which prevents antitrust defendants from defending on the ground that the plaintiff's claimed injury must be reduced by the extent to which the plaintiff passed on the price increase to others. Investigation of and litigation over all of the ripple effects of any single antitrust violation would be massive, and violators should not benefit from the fact that not all of the distant but theoretically affected purchasers will pursue their claims. Rather, in the interest of swift, efficient enforcement, and in the interest of requiring the violator to disgorge the full amount of whatever benefit it received from charging inflated prices, *Hanover Shoe* and *Illinois Brick* limit antitrust actions to the claims of direct purchasers and require that violators pay the entire amount of the overcharge to those direct purchasers.

The critics of *Illinois Brick* contend, with equal force, that antitrust violations injure persons far beyond the direct purchaser, and that the costs incurred (by both the parties and the courts) in identifying those victims and quantifying the amount of their injury are worthwhile in order to provide a remedy to all who have been injured. Allowing the direct purchaser to recover the entire amount by which it was overcharged, even if it passed on all or most of that overcharge

to others, results in a windfall to the direct purchaser at the expense of the true victims farther down the chain, who are precluded from any recovery against anyone. We have the investigative and analytical tools with which to perform a more accurate and comprehensive analysis of the impacts of antitrust violations, and we should not settle for the rough and incomplete justice provided by *Illinois Brick* and *Hanover Shoe*.

Both views have merit, and it is up to the Legislature to decide which approach Massachusetts should take. What makes no sense, however, is to take both approaches at once in the same State court system. If, as the court has now decided, the *Illinois Brick* approach is taken under the Massachusetts Antitrust Act and G. L. c. 93A, § 11, while the opposite approach is taken under G. L. c. 93A, § 9, the two conflicting approaches eviscerate each other. We will not enjoy the pragmatic efficiency of *Hanover Shoe* and *Illinois Brick*, because the parties and our courts will incur all of the costs of identifying and quantifying the damages to indirect purchasers in actions brought under G. L. c. 93A, § 9. Nor will we enjoy the full compensation for victims that would otherwise justify the cost of that enormous investigatory effort, because the principles of the Massachusetts Antitrust Act (and hence the Federal precedent of *Hanover Shoe* and *Illinois Brick*) are still applicable to actions brought under G. L. c. 93A, § 11.

Using the present case as an example, the plaintiff will now undertake the daunting task of tracing how increased prices for one minute component in a variety of consumer products filtered down through multiple chains of manufacturers, wholesalers, distributors, and retailers. Such an exercise is necessary in order to show that the plaintiff, as the ultimate consumer of those products, paid any increased price at all.[8] As a byproduct of that labor-intensive investigation, the plaintiff's counsel will identify many other victims from the ranks of manufacturers, wholesalers, distributors, and retailers, victims who are in trade or commerce and who will (by both G. L. c. 93, § 1, and G. L. c. 93A,

---

[8]Indeed, the tracing exercise could ultimately show that, due to either contract commitments or market forces, entities higher up in the distribution chain were unable to pass on the increased prices, such that those increased prices never filtered all the way down to the consumer level.

§ 11) still be bound by the constraints of *Illinois Brick*. We will have taken on all of the costs that *Hanover Shoe* and *Illinois Brick* seek to avoid, but, where G. L. c. 93A, § 11, and the Massachusetts Antitrust Act still adhere to *Hanover Shoe* and *Illinois Brick*, we will not reap the full benefits of incurring all those costs.[9]

Interpreting G. L. c. 93A, § 9 (1), in a manner that pursues these conflicting policies simultaneously means that the Legislature has made no policy choice at all. It is perfectly rational to follow *Hanover Shoe* and *Illinois Brick*, and it is perfectly rational to reject them. It is not rational both to follow and to reject them at the same time in the same court system, and we should not lightly infer such legislative schizophrenia.

---

[9]We must also invent some method of preventing the imposition of multiple liability. Antitrust defendants will, under G. L. c. 93, § 12, and *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (*Hanover Shoe*), be liable to direct purchasers for the full amount of whatever inflated price resulted from the violation, without any reduction for the amount by which the direct purchaser passed on that inflated price to others. When an indirect purchaser consumer then claims that she has been injured because those same increased prices were passed down to her, she will be seeking to have the violator pay again for damages it has already paid in full.

Not surprisingly, most of the State Legislatures that have rejected *Illinois Brick* have simultaneously adopted provisions to address this multiple liability problem. Several States have effectively repealed *Hanover Shoe* along with *Illinois Brick*, allowing a defendant to defend on the ground that the plaintiff passed the overcharge on to others. See Haw. Rev. Stat. § 480-13(c)(2) (1993 & Supp. 2000); N.M. Stat. Ann. § 57-1-3(C) (2000); N.Y. Gen. Bus. Law § 340(6) (McKinney Supp. 2002); N.D. Cent. Code § 51-08.1-08 (1999). Others allow a setoff for amounts that the defendant has already paid to victims higher up the chain. See Idaho Code § 48-108(2)(a) (Supp. 2000); R.I. Gen. Laws § 6-36-12(a)(1) (2001); Wis. Stat. Ann. § 133.18(1)(a) (2001). Other States provide for transfer and consolidation of actions so that problems of multiple liability and duplicate recovery may be avoided at the outset. See D.C. Code Ann. § 28-4509(c) (2001); 740 Ill. Comp. Stat. § 10/7(2) (2001); Vt. Stat. Ann. tit. 9, § 2465(b) (Supp. 2001). Finally, others simply authorize the court to "take any steps necessary to avoid duplicative recovery against a defendant." Minn. Stat. Ann. § 325D.57 (2000). S.D. Codified Laws § 37-1-33 (2000). That our Legislature has done nothing to address the problem of multiple liability is one more reason to conclude that the 1979 amendments to G. L. c. 93A, § 9 (1), were not intended to repeal *Illinois Brick*. In the wake of today's opinion, we will have to craft a judicial solution to this problem with no legislative guidance, and, by definition, any solution we craft will be contrary to the unambiguous adoption of Federal antitrust principles in G. L. c. 93, § 1.

"[R]eason and common sense are not to be abandoned in the interpretive process, as it is to be supposed that the Legislature intended to act in accordance with them." *Wild* v. *Constantini*, 415 Mass. 663, 668 (1993), quoting *VanDresser* v. *Firlings*, 305 Mass. 51, 53-54 (1940). "We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable." *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). Here, the court's literal interpretation of G. L. c. 93A, § 9 (1), an interpretation that ignores the history underlying the 1979 amendments to § 9 (1), results in the adoption of inherently inconsistent policy choices that irrationally defeats the objectives to be served by either of those choices. The decision whether to follow or to reject *Illinois Brick* is difficult and controversial, with significant consequences to claimants, defendants, and the court system. I believe that the Legislature has in fact made its choice unambiguously in G. L. c. 93, § 1, and G. L. c. 93A, § 11. The Legislature is free to make the opposite choice, but I do not find any articulation of such a contrary choice in the mere insertion of the word "method" in G. L. c. 93A, § 9 (1), particularly not where it would lead to simultaneous pursuit of inherently conflicting choices. I therefore respectfully dissent.